IRENE BRADY, Administratrix of the Estate of EARLE A. BRADY, Deceased, v. SOUTHERN RAILWAY COMPANY.

(Filed 16 December, 1942.)

**1. Master and Servant § 27: Negligence § 19a—**

The breach of the duty to guard against injury to others imposes responsibility for consequences which are probable, and which could reasonably have been foreseen, according to ordinary and usual experience, but not for consequences which are merely possible according to occasional experience.

**2. Master and Servant § 27—**

In an action for damages, based on the wrongful death of a brakeman by the negligence of defendant railroad, where the evidence was that a freight car, being switched and on which the brakeman was riding, struck the blunt, or "wrong" end of an unlighted, closed derailer, in good mechanical order and of the ordinary type in general and approved use, which (derailer) should have been opened by the brakeman before switching, causing the freight car to be thrown with such force against the opposite rail, which was worn, as to derail the car, resulting in the death of the brakeman. *Held:* Defendant's motion of nonsuit should have been granted, as reasonably prudent foresight could not have anticipated the result.

**3. Same: Negligence § 19c—**

Where plaintiff's intestate, a brakeman, was killed by the derailment of the front trucks of a freight car, upon which he was riding in switching operations, and all of the facts relating to the derailment were known, alleged and set forth in evidence and the case tried on the grounds selected by plaintiff, without reference to *res ipsa loquitur*, the facts do not make out a case of *prima facie* negligence and carry the case to the jury on the theory that "the thing speaks for itself."

**4. Master and Servant § 28: Negligence § 10—**

The plaintiff fails to show that the injury and death of her intestate was the proximate result of defendant's negligence, when the evidence points unerringly to the conclusion that her intestate himself failed to open the derailer or to see that it was open, it being his duty so to do before signaling the engineer to move the cars, hence he conclusively assumed the risk of the resulting injury and death.

APPEAL by defendant from *Warlick, J.,* at March Term, 1942, of GUILFORD.   Reversed.

This was an action under the Federal Employers' Liability Act to recover for the wrongful death of plaintiff's intestate alleged to have been caused by the negligence of the defendant.

Plaintiff's intestate was a brakeman employed by the defendant in interstate commerce, and was killed while so engaged.   It was alleged that while he was a member of the crew of a freight train and engaged in shifting cars, at night, at Hurt, Virginia, a freight car on which he was standing, in order to signal switching operations, struck a derailer, and that in consequence the car was derailed, and he lost his life. The complaint alleged that his injury and death was due to the negligence of the defendant in that it failed to provide for him a reasonably safe place in which to work; that the track and instrumentalities at that point were worn and defective and the derailer improperly installed. It was also alleged that the defendant failed to provide a light or other warning to show that the derailer was at the time closed.

The defendant denied the several imputations of negligence, and also pleaded that plaintiff's intestate had assumed the risk of injury in the way in which he was injured, and that by his own negligence he had contributed to his injury and death.

Issues raised by the pleadings were submitted to the jury, and verdict rendered in favor of the plaintiff, finding that the death of plaintiff's intestate was due to the negligence of the defendant, that he did not assume the risk of being killed as alleged in the answer, nor by his own negligence contribute to his injury and death.   Substantial damages for the benefit of the widow and dependent children of the decedent were awarded.   From judgment in accordance with the verdict, defendant appealed.

*Frazier & Frazier and D. E. Hudgins for plaintiff, appellee.*
*W. T. Joyner and R. M. Robinson for defendant, appellant.*

DEVIN, J.   The question chiefly debated on the appeal was whether the evidence offered by the plaintiff was sufficient to carry the case to the jury.   The defendant assigns error in the failure of the court below to sustain its motion for judgment of nonsuit.   The determination of this question requires a careful consideration of the evidence adduced at the trial as shown by the record before us.   The material facts as thus made to appear may be stated as follows:

The plaintiff's intestate was a member of the train crew in charge of a freight train proceeding north, during the early morning hours of 25 December, 1938.   There were thirty-seven cars in the train.   The

crew consisted of five, viz.: engineer, fireman, conductor, flagman, and the brakeman, who was plaintiff's intestate. No other person was on or about the train at the time of the injury.

At Hurt, Virginia, the train stopped and backed into a siding or pass track to permit a northbound passenger train to pass. At this place the railroad ran north and south and there were four tracks, counting from west to east, as follows: house track, main line southbound, main line northbound, and a pass track, the easternmost of the tracks. On this pass track, near its northern terminus and a short distance south of the switch was located, on the east rail, a derailer. A derailer is a heavy metal safety device placed near the rail and controlled by a lever to enable it to be pulled close against the rail, so that when so placed the inclined groove and flange on the derailer will serve to guide a car wheel onto and across the top of the rail, and derail the car. Its purpose is to prevent freight cars on the sidetrack, which for any reason might be set in motion, from rolling down the track and onto the main line. The derailer is placed near the downgrade end of the side or pass track, and is ordinarily kept closed—that is, pulled up to the rail—so that a car moving toward the switch would be derailed.

On this particular pass track the grade was northward, and the derailer was connected to the east rail and so placed that when closed it would derail a car moving northward, that is with the derailer's upward inclination and flange, for the guidance of a car wheel, extending northward and outward. On the opposite side of the derailer, called by the witnesses the "blunt" or "wrong end," instead of presenting an inclined surface and flange, the derailer presented an end vertically abrupt, extending some three or four inches above the level of the crossties on which it was placed and sloping to the right. It appears from the photograph used in evidence that the flange designed to guide the car wheel over the rail when approaching from the "right" side, would tend to deflect the wheel in the opposite direction when the derailer was struck on the "wrong" end.

The freight train arrived at this point about 6 a.m. and the occurrences complained of took place while it was yet dark, and the trainmen used lanterns. The switching operations there were performed in the following sequence: The freight train pulled past the northern switch of the pass track, and the conductor got off, opened the switch and opened the derailer. The train backed into the pass track, and the switch and derailer were closed by the brakeman. There were twelve freight cars at the south end of the pass track which were to be picked up by this freight train. These were south of the south end of the train. The conductor and flagman then went to check up these twelve cars, seventy-five or eighty car lengths from the north end of the pass

track. After the passenger train passed, the north switch and the derailer were opened by the brakeman. The engineer, whose testimony was offered by the plaintiff, said he saw the brakeman set the derailer open. The freight train then pulled out on the main line, the switch was closed, and the freight train backed south along the main line track, south of a highway crossing. The brakeman then cut off four empty gondola shaped coal cars next to the engine, and the engineer with these empties, the brakeman on the rear, moved north beyond the switch for the purpose of backing into the pass track and picking up the twelve freight cars, which with the four empty coal cars were to be carried to Lynchburg. On this movement, the brakeman got off at the switch, opened the switch and got on the end of the rearmost coal car, standing on the metal step, on the southeast corner of the car, and with his lantern signaled to the engineer the movement of the engine and cars into the pass track. This cut of cars was moving at the rate of three or four miles per hour. When the lead coal car on which the brakeman was standing reached the derailer, it was found to be closed, and the wheels of the car struck the blunt or wrong end of the derailer, with this result. The front trucks of the lead coal car were derailed to the west, the brakeman was thrown off in some way, and was crushed under the wheels. The rear trucks of the lead coal car remained on the track. The front trucks of the next car were derailed to the east, the front trucks of the third car were derailed to the west, and those of the fourth car to the east. The rear trucks of each of the cars remained on the track. No rails were broken or track torn up.

Here a pertinent question arises. When the freight train pulled out of the pass track onto the main line, who closed the derailer? No witness has testified he saw the brakeman do so, but the conclusion seems inescapable from the circumstances disclosed by the testimony of the engineer (offered by plaintiff) that no one else could possibly have done so. He was the last man to touch the derailer. He opened it, together with the switch, for the freight train to pass out. He closed the switch for the movement of the train south on the main line. It was his job to look out for the switch and the derailer. When the cut of empty cars a few minutes later came back into the pass track the derailer was found closed. No one else but the brakeman had been there or had opportunity to touch it. The engineer and fireman were on the engine. The conductor and flagman were more than a quarter of a mile away. The conductor was checking the twelve cars, and the flagman flagging the south end of the freight train. There was no other trainman, or any other person, present. The opening and closing of the derailer was effected by a lever operated by hand. It was in no sense automatic.

BRADY *v.* R. R.

The gravamen of plaintiff's complaint and the evidence upon which she bases her case was that the west rail of the pass track, opposite the derailer, was worn and defective, causing a slope westward, so that when the front wheel of the coal car struck the blunt end of the derailer, the defective condition of the west rail, in its relation to the derailer, caused the car to jump the track to the west; that if the west rail had been level and of proper height the wheels would likely have remained on the track in spite of the jolt from contact with the wrong end of the derailer. The plaintiff offered the testimony of two witnesses to the effect that the west rail was old and worn, that the ball or top of the rail was very thin and badly worn; that metal slivers were picked from the top of the rail and along on each side; that the crossties on which the derailer was resting slanted to the west; that the west rail had the date of 1912 stamped on it.

The plaintiff then presented two experienced railroad brakemen who had had ten years' experience as brakemen, switching on yards and making up trains, and offered them as expert witnesses. The court found them to be experts and permitted them to express their opinions in response to hypothetical questions. The hypothetical question propounded to each of those expert witnesses embraced the facts in evidence and was based on the finding by the jury that "the west rail on the pass track and particularly the ball and edges of the same were decayed, rusty, old and badly worn down and worn away; that the crossties, on which the pass track at and about the point where the derailer was located, sloped to the west." The question called for the expression of an opinion on these assumed facts as to what caused the derailment of the car upon which the deceased was riding. One of the expert witnesses, Mr. Holden, replied: "In my opinion it was caused by the inferior rail— that is, the rail opposite the derailer on the pass track." The other witness, Mr. Heritage, replied: "The derailment would be due to the defective rail on the west side." This witness also testified, from an examination of a photograph which had been offered to illustrate the testimony of witnesses, that on the derailer there was a groove which the flange of a car wheel coming from the wrong direction could follow if in line and this would tend to cause the wheel to come down on the rail, but if the derailer was out of line to the west it would have a tendency to twist the wheel that way, and the defective west rail would not have enough "ball" to hold the wheel and it would be likely to climb over and cause derailment; that the worn condition of the rail would tend to widen the gauge. He further testified that by reason of defective or worn condition of the west rail, when a car hit the wrong end of the derailer, it might cause the wheels to go outside the flange on the derailer, instead of into the groove, and thus throw the car to the west.

However, to cause the wheel on the car coming in contact with the wrong end of the derailer to go outside the flange, the opposite rail would have to be badly defective—that is, three-quarters of an inch would have to be worn away from the ball of the rail. The original width of the ball would be two and a half to two and three-quarters inches wide. He also testified that it was the duty of the brakeman to see that the derailer was open before signaling the engineer to back into a pass track.

Neither of these expert brakemen had seen more than two or three instances in their long experience where car wheels had struck the wrong end of a derailer. It appeared that that was never intended, was always to be avoided, and rarely happened. The derailer was not designed to afford passage over it by a wheel coming from the wrong direction.

There was no evidence that the gauge of the rails had been affected. There does not seem to be any evidence, or allegation, that the derailer itself was other than the ordinary type of derailer in general and approved use by railroads in this section, nor that there was anything broken or out of repair about this solid piece of iron or the lever by which it was controlled.

It may be observed that the rails on a pass track, as well as on all other tracks, are placed for the purpose of providing means for the passage of trains and cars. While there was evidence here that the west rail on the pass track opposite the derailer was old and worn, it had proved adequate to bear the weight of a long freight train and heavy engine which twice passed safely over it immediately before the four empty coal cars were derailed. Was the defendant negligent in failing to foresee that if the wheel of a freight car should strike the wrong or blunt end of the derailer, the worn place in the west rail opposite would cause the car to be derailed? Could the defendant, in the exercise of due care, have foreseen that retaining on its pass track a rail which was worn on top, but adequate for the passage over it of trains, would cause the derailing of a freight car and injury to a trainman in the unusual event the freight car should strike the wrong end of a derailer? The defects in the rail could only have caused injury in the event the wheels of a car struck the derailer on the blunt end, that is, coming from the opposite direction from that in which the derailer was intended to serve its useful purpose. Striking a derailer from the wrong direction, it appears from the evidence, was so unusual, so contrary to the purpose for which the derailer was placed and the use to which it was applied, that prevision to guard against possible consequences of such a contingency could hardly be charged to the railroad company. The contingency was remote so that we feel constrained to express the opinion that the duty to guard against it, in the exercise of due care, was more than should have been imposed upon the defendant, and that responsi-

bility should not attach for the unexpected consequences, however deplorable.

·Where the duty to guard against injury to others grows out of certain relationships and circumstances, breach of such duty imposes responsibility for consequences which are probable, and which could reasonably have been foreseen, according to ordinary and usual experience, but not for consequences which are merely possible according to occasional experience. *Stone v. R. R.,* 171 Mass., 536, 41 L. R. A., 794. "The rule is that one is bound to anticipate those consequences of his negligent act or omission which in the ordinary course of human experience, might reasonably be expected to result therefrom." 38 Am. Jur., 710. Foreseeability is a necessary element in actionable negligence, and must be made to appear before liability can be imposed for the consequences of a wrongful act or omission. This principle was stated in *Osborne v. Coal Co.,* 207 N. C., 545, 177 S. E., 796, as follows: "The law only requires reasonable foresight, and when the injury complained of is not reasonably foreseeable, in the exercise of due care, the party whose conduct is under investigation is not answerable therefor." This statement of the law has been frequently cited with approval, and the principle applied in numerous cases. *Butner v. Spease,* 217 N. C., 82, 6 S. E. (2d), 808; *Guthrie v. Gocking,* 214 N. C., 513, 199 S. E., 707; *Newell v. Darnell,* 209 N. C., 254, 183 S. E., 374; *Beach v. Patton,* 208 N. C., 134, 179 S. E., 446. *Justice Cardozo,* in *Bird v. St. Paul Fire & Marine Ins. Co.,* 224 N. Y., 47, expressed the same idea in these words: "The wrongdoer may be charged with those consequences only within the range of prudent foresight." In *Milwaukee & St. Paul Ry. Co. v. Kellogg,* 94 U. S., 469, it was said that "it must appear that the injury was the material and probable consequence of the negligent or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." From *Stone v. R. R., supra,* we quote, "One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable." *Snyder v. R. R.,* 36 Col., 288.

"The substance of it all, stated and restated in various ways, is that negligence carries with it liability for consequences which, in the light of attendant circumstances, could reasonably have been anticipated by a prudent man, but not for casualties which, though possible, were wholly improbable. One is not charged with foreseeing that which could not be expected to happen." *Wyatt v. Chesapeake & Potomac Tel. Co.,* 158 Va., 470, 163 S. E., 370.

Negligence was also charged against the defendant for failure to light the derailer. It was testified, however, that lights were not used on derailers outside of yards, and the engineer testified he had not seen lights on a derailer. The fact that there was no light on the small target indicating the position of the derailer in question, under the circumstances of this case, would not alone be evidence of negligence, in the absence of showing that placing lights on such targets was in accord with general and approved usage. *Pleasants v. Barnes,* 221 N. C., 173. The testimony of a witness that at some time subsequent to the injury he saw, in the daytime, a light on this target could not be held competent to show negligence. *Parrish v. R. R.,* 221 N. C., 292 (299), 20 S. E. (2d), 299; *Shelton v. R. R.,* 193 N. C., 670, 139 S. E., 232; *Lowe v. Elliott,* 109 N. C., 581, 14 S. E., 51.

There was no evidence that the derailer in this case would not properly perform the function for which it was designed and installed, as was the case in *Mumpower v. R. R.,* 174 N. C., 742, 94 S. E., 515.

While the plaintiff does not invoke the doctrine of *res ipsa loquitur* or refer to it as ground for denial of defendant's motion for nonsuit, in view of the evidence that plaintiff's intestate came to his death as the result of the derailment of a freight car, we have considered the question, and reach the conclusion that the principle expressed by that phrase is inapplicable to the facts of this case. Here, all the facts relating to the derailment of the car are known, and the particular cause thereof is alleged in the complaint, and fully set forth in plaintiff's evidence. The case was fought out on ground selected by the plaintiff. Under the circumstances of this case we are not inclined to hold that the fact of the derailment of the front trucks of the freight car on which the brakeman was riding is alone sufficient to make out a *prima facie* case of actionable negligence and carry the case to the jury on the theory that "the thing itself speaks." *Baldwin v. Smitherman,* 171 N. C., 772, 88 S. E., 854; *White v. Hines,* 182 N. C., 275, 109 S. E., 31; *Clodfelter v. Wells,* 212 N. C., 823, 195 S. E., 11.

In addition to what we must regard as the failure of the plaintiff to show that the injury and death of her intestate was the proximate result of actionable negligence on the part of the defendant, there is another ground upon which we think the plaintiff's case must fail. The plaintiff's evidence points unerringly to the conclusion that the brakeman, himself, unfortunately failed to open the derailer, or to see that it was open, before he signaled the engineer to move the four cars into the pass track. Hence, having himself handled the derailer, and having neglected to place it open for this last movement of cars, as it was his duty to do, he would be conclusively deemed to have assumed the risk of an injury which was caused by his own act or omission. *Southern Ry. Co. v.*

*Youngblood,* 286 U. S., 313; *Unadilla Valley Ry. Co. v. Caldine,* 278 U. S., 139, 73 L. Ed., 224 (note). And his negligence in this respect would be regarded as the sole proximate cause of his injury. *Powers v. Sternberg,* 213 N. C., 41, 195 S. E., 88; *Butner v. Spease, supra; Jeffries v. Powell,* 221 N. C., 415. The amendment of 1939 to the Federal Employers' Liability Act is inapplicable here. *McCrowell v. R. R.,* 221 N. C., 366 (377).

This case is an important one to the parties, and its decision is not without difficulty. Counsel for both plaintiff and defendant presented their respective causes with ability, and their excellent briefs have been of assistance. After careful consideration, we reach the conclusion that defendant's motion for judgment of nonsuit should have been allowed, and that the judgment of the Superior Court must be

. Reversed.