483 F.2d 1044
 MILLERS MUTUAL INSURANCE ASSOCIATION OF ILLINOIS, Appellee,
v.
SOUTHERN RAILWAY CORPORATION, Appellant.
MILLERS MUTUAL INSURANCE ASSOCIATION OF ILLINOIS, Appellee,
v.
CENTRAL SOYA COMPANY, Appellant.
 Nos. 73-1465, 73-1466.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1973.
Decided Nov. 8, 1973.
 
 Harold K. Bennett, Asheville, N. C. (W. T. Joyner, Raleigh, N. C. and Bennett, Kelly & Long, Asheville, N. C., on brief), for appellant in No. 73-1465.
 O. E. Starnes, Jr., Asheville, N. C. (Van Winkle, Buck, Wall, Starnes & Hyde, P. A., Asheville, N. C., on brief), for appellant in No. 73-1466.
 Charles R. Worley, Asheville, N. C. (J. M. Baley, III, McGuire & Wood, Asheville, N. C., on brief), for appellee in Nos. 73-1465 and 73-1466.
 Before BOREMAN, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 
 1
 Some time during the winter of 1970, the Earle-Chesterfield Mill received from Central Soya Company six railroad cars of No. 2 yellow corn shipped via Penn Central and Southern Railway. Some days later hot spots and smoldering heat or fire occurred in one of the corn storage bins, resulting in damage to 19,426 bushels of corn, considerable injury to the bin itself, and incidental expense-a net loss to Earle-Chesterfield of approximately $24,000. The plaintiff, Millers Mutual Insurance Association of Illinois, paid Earle-Chesterfield Mill under a fire insurance policy and then, as subrogee to the Earle-Chesterfield claim, sued Central Soya, Penn Central, and the Southern Railway in the United States District Court. From a judgment entered against them on a jury verdict of negligence in furnishing and transporting the corn, Central Soya and Southern Railway have appealed.[1]
 
 
 2
 We think the district court erred in failing to grant motions of Central Soya and Southern for judgment notwithstanding the verdict, and reverse.
 
 
 3
 The lawsuit grew out of the misadventures of Southern Railway covered hopper car 96398, designated "For Phosphate Loading Only" but diverted by Southern for a shipment of unslaked lime. It was then again used for a shipment of phosphate and came into the custody and control of Penn Central at Cincinnati. The waybill that accompanied car 96398 was plainly marked, "When empty return to Occidental Corp., Occidental, Fla. via reverse route." Instead of returning the car empty, Penn Central furnished it to Central Soya in February 1970 for a shipment of corn consigned to the Earle-Chesterfield Mill in Asheville, North Carolina. Accepting delivery of the grain-loaded car from Penn Central, Southern transported it to Asheville, where Earle-Chesterfield's employees unloaded the corn directly into their bins -so far without untoward incident. During unloading the employees noticed "little white pellets" in the corn. Several days later hot spots developed in the bin that contained the Central Soya corn. The smoldering heat and resulting damage were caused by residual quantities of unslaked lime present in car 96398 when it was loaded with corn.
 
 
 4
 The complaint alleged that all three defendants were negligent, and the case was tried on that theory,[2] resulting in a verdict and judgment against all defendants.
 
 Central Soya
 
 5
 Central Soya urges that the trial judge should have either directed a verdict in its favor or granted its motion for judgment notwithstanding the verdict. We agree, and reverse the verdict of negligence as to Central Soya.
 
 
 6
 We apply a federal standard to determine whether the plaintiff's case presented a jury question. Wratchford v. S. J. Groves & Sons Co., 405 F.2d 1061 (4th Cir. 1969). The test is whether, viewing the evidence in the light most favorable to plaintiff, we find "substantial evidence supporting the verdict." C. Wright, Law of Federal Courts Sec. 95, at 425 (2d ed. 1970).
 
 
 7
 The case was tried under the law of North Carolina and none of the parties has formally challenged the choice of law on appeal. During oral argument, however, counsel for Central Soya expressed a belief that its conduct should be judged by Ohio law. We believe that the trial court was correct in applying North Carolina law to plaintiff's claims against the shipper. As a federal court sitting in North Carolina, we apply North Carolina's rule on conflicts. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S. Ct. 1020, 85 L.Ed. 1477 (1941). The North Carolina Supreme Court's most recent decision on the choice of law in tort cases reveals a determination to retain the rules of lex loci delicti. Petrea v. Ryder Tank Lines, Inc., 264 N.C. 230, 141 S.E.2d 278 (1965). Under this principle, the law of the case is not drawn from the place where the alleged negligence occurred, but from "the state where the last event necessary to make an actor liable for an alleged tort takes place." Restatement of the Conflict of Laws Sec. 377 (1934). Apparently the unslaked lime did not absorb sufficient moisture en route to get "hot"; the injury occurred in the bin at the Earle-Chesterfield Mill in North Carolina, and thus North Carolina law will govern. Cf. Brendle v. General Tire & Rubber Co., 408 F.2d 116 (4th Cir. 1969).
 
 
 8
 The North Carolina courts have decided only one case on a shipper's liability for using defective railroad cars. In Yandell v. National Fireproofing Corp., 239 N.C. 1, 79 S.E.2d 223 (1953), National Fireproofing shipped material in an obviously defective boxcar. During the unloading process, a door fell off the boxcar and injured an employee of the consignee. On demurrer, the North Carolina Supreme Court held that a shipper would be liable for loading a defective railroad car if it had actual or constructive knowledge that the car would be dangerous for unloading.
 
 
 9
 Yandell does not hold that actual or constructive knowledge is a necessary prerequisite for successful suits against shippers, but we think it so intimates, and the law of other jurisdictions supports such a rule. Under the federal common law that prevailed before Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this circuit held that shippers may ordinarily assume that railroads have inspected the cars they furnish. The court made only one tentative exception to this broad statement, saying that a shipper might be negligent if it ignored an obvious danger. Waldron v. Director General of Railroads, 266 F. 196 (4th Cir. 1920). The Texas Supreme Court has gone to the extreme position that a shipper cannot be charged with knowledge of defects in a vehicle furnished by a carrier even if reasonable inspection would have revealed the danger. A. J. Tebbe & Sons Co. v. Brown Express, 161 Tex. 456, 341 S.W.2d 642 (1960). See also 13 Am.Jur.2d Carriers Sec. 173 (1964). Although all these cases, including Yandell v. National Fireproofing Corp., involved personal injuries to employees of the consignee, we think a shipper's duty must be the same with respect to property damage.
 
 
 10
 As a matter of general negligence law, the Second Restatement of Torts supports our conclusion that actual or constructive knowledge is a precondition to liability for loading a defective car.
 
 
 11
 It is negligence to use an instrumentality . . . which the actor knows or should know to be so . . . inappropriate or defective, that its use involves an unreasonable risk of harm to others.
 
 
 12
 Restatement (Second) of Torts Sec. 307 (1965), quoted in Scott v. Clark, 261 N. C. 102, 107-108, 134 S.E.2d 181, 185 (1964). A comment to that section seems to cover the shipper's duty to inspect cars furnished by the railroad:
 
 
 13
 If a third person has turned over the thing to the actor for the purpose of the particular work or similar work, the actor usually is entitled to assume that the thing is in normally fit condition unless there is some reason to suspect the contrary.
 
 
 14
 Id., comment b, at 99. See also, id. Sec. 300, commnt c.
 
 
 15
 Applying the rule that we believe the North Carolina courts would adopt, we conclude that the trial judge erred in submitting the question of Central Soya's negligence to the jury. The record contained no evidence that Central Soya had actual knowledge that car 96398 contained residual deposits of unslaked lime. Nor do we find any evidence that would support a finding of constructive knowledge, i.e., that the circumstances are such that it is fair to impute to Central Soya knowledge it did not have. Penn Central had furnished this car to Central Soya with knowledge that it would be used for a corn shipment. Central Soya was entitled, in the absence of suspicious circumstances, to assume that the car was suitable for hauling grain. There was nothing about the exterior appearance of the car to suggest that it contained a dangerously incompatible substance. Although the car bore the stenciled legend, "For Phosphate Loading Only," Gregory Minch testified for Central Soya that it was "no different" from other stenciled cars they had used. The record showed that in the course of using similarly stenciled cars, Central Soya had received only one other complaint of foreign material in the corn it shipped, and that apparently occurred after the shipment to Earle-Chesterfield.[3] Moreover, the testimony of plaintiff's witnesses James M. West-all and Charles W. Parish indicated that phosphate and corn were compatible and that no harm would have resulted if the residue later discovered in the car had been phosphate instead of unslaked lime.
 
 
 16
 Even if we assume arguendo that Central Soya had a duty to inspect the car in the absence of suspicious circumstances, we believe its employees sufficiently discharged the duty. Gregory Minch testified that Central Soya's employees made a visual inspection which revealed only that the car was empty and that no remnants of previous loads were visible. We think this was all they could be expected to do without special facilities.[4] The evidence established that each hopper of the car had only two openings that would permit inspection: the loading hatch on top and a sliding gate at the bottom. The bottom opening is only 18 inches off the ground, and it would be difficult, if not impossible, for a man to crawl up inside the car to inspect it. The top opening permits a cursory visual inspection of the inside, but the absence of light and the hopper's funnel-like configuration would make discovery of foreign substances largely a matter of chance. Moreover, discovery of a residue of white powder or pellets would not necessarily put Central Soya on notice of the danger of an incompatible substance.
 
 Southern Railway
 
 17
 Southern Railway raises several points of error on appeal, urging mainly that the trial judge erred in denying its motions for directed verdict and judgment n. o. v. We have concluded that plaintiff did not make out a prima facie case of negligence against Southern and therefore we reverse.
 
 
 18
 Ordinarily the Interstate Commerce Act's Carmack Amendment, 49 U. S.C. Sec. 20(11) (1970), governs railroad liability for damages to interstate shipments. The statute essentially adopts the common law of carriers and makes railroads virtual insurers against loss or damage to property received for transportation.[5] Yet plaintiff chose to try the case on the theory of negligence. Since the opening paragraph of plaintiff's brief displays counsel's awareness and understanding of the "insurance" theory of liability, we must assume this was a deliberate tactical choice. In Litvak Meat Co. v. Baker, 446 F.2d 329 (10th Cir. 1971), the Tenth Circuit held that the Carmack Amendment leaves room for this kind of election.
 
 
 19
 Doubtless, counsel's choice was dictated by a belief that the evidence would tend to show that the corn arrived in good condition and that the unslaked lime became "hot" after being unloaded into Earle-Chesterfield's bins. Damages included not only the corn but also injury to the bin. Indeed, the record suggests no heating occurred until several days after unloading. Thus there is some question about the Carmack Amendment's applicability to this case. Still, in a case that strongly parallels this one, the Sixth Circuit held that the Carmack Amendment was the consignee's exclusive remedy. American Synthetic Rubber Corp. v. Louisville & N.R. R., 422 F.2d 462 (6th Cir. 1970) (the railroad delivered the wrong car, and the consignee unloaded ethylene oxide into facilities for butadiene). See also W. D. Lawson & Co. v. Penn Central Co., 456 F.2d 419 (6th Cir. 1972); Sylgab Steel & Wire Corp. v. Strickland Transportation Co., 270 F.Supp. 264 (E.D.N.Y. 1967).
 
 
 20
 Although we are inclined to think the Carmack Amendment preempts state remedies in the area that it covers, the posture of this case weighs heavily in favor of applying state law. Even now all parties seem content with the application of state law, and we are hesitant to inject a theory on appeal that has not been considered below and is not presently urged upon us.
 
 
 21
 The evidence established that Southern Railway had used car 96398 for a shipment of unslaked lime, had not cleaned the car before the phosphate shipment, and that residual deposits of lime remaining in the car caused the damage to the corn and storage bin. It is true, of course, that had Southern "cleaned" the car of lime the damage would not have occurred, but under North Carolina law foreseeability is an essential element of proximate cause, Sutton v. Duke, 277 N.C. 94, 176 S.E.2d 161 (1970); Brady v. Southern Ry., 222 N.C. 367, 23 S.E.2d 334 (1942), aff'd, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943), and the evidence in this record does not support a finding of foreseeability.
 
 
 22
 We agree with the trial judge's instruction that foreseeability does not require "that the defendant must have foreseen the injury in the exact form in which it occurred, but requires only that in the exercise of reasonable care the defendant or defendants might have foreseen that some injury would result from his act or omission or that consequences of a generally injurious nature might have been expected." See Johnson v. Lamb, 273 N.C. 701, 161 S.E.2d 131 (1968). But we are convinced that plaintiff has failed to show that Southern should have foreseen that its use of car 96398 would spawn any harmful consequences. Although Southern knew that it had released an unclean car to Penn Central, it could reasonably assume that Penn Central would (a) return the car empty or, failing that, (b) clean the car before furnishing it for any commodity other than phosphates. This is so because of railroad rules that may be likened to the law of the trade or shop. Association of American Railroads Circular CSD 435, which was binding on both Southern and Penn Central, provided:
 
 
 23
 Class "L" Car Types, in interline service . . . after being unloaded shall be returned promptly to the originating line via reverse of service route . . . . The only exception to [this] procedure . . . shall be on specific instructions by the car owner, or by the Car Service Division [of the American Association of Railroads].
 
 
 24
 Plaintiff insists, however, that regardless of the "return empty" rule, actual practice in the industry was to the contrary and that Southern was glad indeed to have the revenue for hauling corn rather than to have its stenciled instruction honored. Plaintiff insists, in short, that the rule is honored in the breach. Thus, in plaintiff's view, Southern knew that in all probability its car would return, not empty, but loaded with some commodity that might well be incompatible with unslaked lime. Various witnesses from Earle-Chester-field and Central Soya testified that most of the cars hauling corn had stenciling on them and that they had received cars with stenciled return instructions and "things like that." One witness recalled that he saw one car stenciled "Return Empty to Southern Railway," and another witness testified that many cars loaded with corn at Earle-Chesterfield were stenciled "Return Empty." Although weak, we think this sort of evidence sufficient to raise a jury question of Southern's capacity to foresee that some injury could result from releasing a car that contained remnants of unslaked lime. It matters not that Southern's testimony was to the contrary and that its superintendent of car distribution testified that the instructions to return empty were followed "pretty strictly."
 
 
 25
 But even though this testimony, liberally construed, permits a jury inference that Penn Central had diverted stenciled cars to grain shipments so often that Southern should have known about it, there is not one scintilla of evidence in the record to suggest that Penn Central had done so without first cleaning the cars. It is not enough for foreseeability that Southern might have anticipated that Penn Central might divert the car containing residual deposits of lime to carry corn unless Southern also should have anticipated and foreseen that Penn Central would violate the rules on inspection and cleaning. American Association of Railroads rule 64(a) imposed the following duty on Penn Central:
 
 
 26
 Car shall be inspected while empty and before each loading by carrier furnishing the equipment and, if necessary, properly cleaned and placed in good condition so that loss of or damage to freight may not result from defects in car, filth, waste, oil, grease or other substance or from anything liable to cause loss of or damage to freight; such inspection to be governed by the kind of freight to be loaded and the probability of loss or damage . . . . Carrier furnishing the equipment shall keep a permanent record showing where car was inspected, name of person making the inspection, condition of car, and extent of inspection at time of such inspection.
 
 
 27
 Penn Central had no inspection records on car 96398.
 
 
 28
 The second paragraph of rule 64(a) reads as follows:
 
 
 29
 When the physical facts developed by inspection at destination or enroute prove beyond a reasonable doubt that car was furnished in a defective, unclean, or otherwise unfit condition to transport the commodity without loss or damage, such facts shall render the origin or carrier furnishing the equipment responsible for the entire loss.[6]
 
 
 30
 We think this rule governs the case. Although Southern was at fault in the sense of setting car 96398 in motion with deposits of unslaked lime, we think it is clear that this rule relieves Southern of liability, permitting it to rely on Penn Central to inspect and clean the car before letting it be used to carry other commodities. For us to hold otherwise would be presumptuous. We lack expertise in the operation of our incredibly complex transportation system. On this record we can only enforce the rule as it is clearly written.
 
 
 31
 Finally, plaintiff urges that the verdict against Southern should be allowed to stand because of its negligence in accepting the car loaded with corn and unslaked lime for the trip to Asheville. We think this contention is without merit. Southern's duty to make a reasonable inspection of railroad cars accepted from another carrier must necessarily, we think, be confined to a duty of exterior inspection-absent circumstances suggesting an interior defect. To hold otherwise is to suggest that each connecting carrier must unload every car before resuming transit. The law cannot go so wide of reality. The most careful inspection of car 96398 after it had been loaded with corn would not have disclosed the presence of unslaked lime. Thus a presumed failure to inspect cannot be said to have been the proximate cause of the subsequent injury and damage.
 
 
 32
 If a delivering carrier is subject to liability of this sort, as plaintiff insists, it must be in the nature of strict liability without regard to fault. Plaintiff points to Lucas & Lewis v. Norfolk S. Ry., 165 N.C. 264, 80 S.E. 1076 (1914), as an indication of this type of liability. We agree that the facts suggest the possibility of such a theory, but in Tucker v. Norfolk & W.R.R., 194 N.C. 496, 140 S.E. 77 (1927), the court limited the strict liability implication of Lucas and explained the liability of the delivering carrier in that case on the ground of obvious danger. Tucker affirmed a judgment of nonsuit in favor of the delivering carrier and in so doing necessarily held, we think, that a plaintiff does not make out a prima facie case against a delivering carrier merely by showing that the car was defective and that the delivering carrier accepted it without an inspection. See also Roy v. Georgia R. & Banking Co., 17 Ga.App. 34, 86 S.E. 328 (1915).
 
 
 33
 In Yandell v. National Fireproofing Corp., 239 N.C. 1, 79 S.E.2d 223 (1953), the North Carolina Supreme Court described the delivering carrier's duty as a "duty to make a reasonable inspection of the car to ascertain whether it is reasonably safe for unloading, and to repair or give warning of any dangerous condition in the car discoverable by such an inspection." Id. at 6, 79 S.E.2d at 227.
 
 
 34
 We have found no North Carolina cases, other than Lucas and Tucker, that help define what is a reasonable inspection at an interchange. Other jurisdictions have uniformly held that delivering carriers do not have to open cars to inspect the interior unless an external inspection suggests interior defects. See Copeland v. Chicago, B. & Q.R.R., 293 F. 12 (8th Cir. 1923); Smith v. Louisville & N.R.R., 267 F.Supp. 716 (S.D.Ohio 1966); Martin v. Southern Pac. Co., 46 F.Supp. 957 (N.D.Cal.1942); Butler v. Central of Georgia Ry., 87 Ga.App. 492, 74 S.E.2d 395 (1953); cf. Butler v. Norfolk S. Ry., 140 F.Supp. 601 (E.D.N.C. 1956) (construing North Carolina law on initial carrier's duty to inspect a sealed car). There was nothing on the exterior of car 96398 to put Southern on notice that the corn in it might be contaminated or dangerous.
 
 
 35
 Plaintiff insists that, entirely aside from on-the-site physical inspection at point of interchange, Southern is charged with knowledge of the transportation history of all of its cars and, indeed, maintains such a history. Thus, plaintiff argues that Southern knew that car 96398 had been loaded with unslaked lime and had not been cleaned when turned over to Penn Central at the interchange. Plaintiff urges that Southern cannot disclaim such knowledge when Penn Central returns the car loaded with corn to Southern. We think the theory wholly unrealistic. There is no evidence in the record suggesting that the employees who actually accept and handle cars at interchanges can readily obtain the history of Southern's cars. Indeed, Southern insists that even with the use of a computer print-out, there is a two-month delay in getting a car's loading history. Nothing in the record contradicts this contention. We think that Southern's obligation to obtain histories on its cars at the interchange, like its duty to inspect, must be limited by the concept of reasonableness. In this instance, the duty that plaintiff would impose on Southern is both impractical and out of proportion to the risk involved.
 
 
 36
 Reversed.
 
 
 
 [1]
 The jury also returned a verdict against Penn Central upon which judgment was entered, but Penn Central has not appealed
 
 
 [2]
 With respect to Central Soya, an alternate theory of breach of warranty of fitness was conditionally submitted to the jury, i. e., that it would not answer the breach of warranty issue unless it absolved Central Soya of negligence. Plaintiff made no objection to this instruction, and the point is not pressed on appeal
 
 
 [3]
 At trial plaintiff introduced Central Soya's answer to an interrogatory that requested information about any other complaints. Central Soya answered as follows:
 We had one complaint from Holly Farms Poultry Industries of Mocksville, North Carolina in the last eighteen months [this set of answers was dated Dec. 13, 1971] that a white substance was in corn shipped to one of their plants. It was concluded that the substance was sodium-tripoly phosphate, a substance often added to poultry feeds in small quantities.
 Transcript at 188.
 
 
 [4]
 Central Soya, like most shippers presumably, had no "cleaning track" such as railroads use
 
 
 [5]
 The Carmack Amendment codifies the common law rule that requires no proof of negligence. Secretary of Agriculture v. United States, 350 U.S. 162, 165 n. 9, 76 S.Ct. 244, 100 L.Ed. 173 (1956). It also allows a plaintiff to make out a prima facie case by proving that the goods were delivered to the carrier in good condition but arrived damaged. Litvak Meat Co. v. Baker, 446 F.2d 329, 336-337 (10th Cir. 1971). While these principles were established by statutory interpretation, the Carmack Amendment's major advantage over common law remedies appears on its face. It allows the holder of a bill of lading to sue either the initial carrier or the delivering carrier for all his damages. The railroad may then sue other carriers that handled the shipment in hope of shifting the loss. 49 U.S.C. Sec. 20 (12) (1970)
 
 
 [6]
 This paragraph is followed by a proviso that changes the rule of liability when the "carrier furnishing the equipment does not receive a switch or road haul of the loaded car." In this case, however, the parties stipulated that Penn Central received both a switching charge and a road haul charge