Edward Lee **BRYAN**, Appellee,

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.**, Appellant.

No. 76–2137.

United States Court of Appeals, Fourth Circuit.

Argued April 8, 1977.

Decided Nov. 9, 1977.

---

1. *See United States v. Manning,* 448 F.2d 992, 999 (2 Cir. 1971).

James E. Davis, Jr. and Howard E. Manning, Raleigh, N.C. (Manning, Fulton & Skinner, Raleigh, N.C., on brief), for appellant.

L. Bruce McDaniel (McDaniel & Fogel, Raleigh, N.C., on brief), for appellee.

Before CLARK, Supreme Court Justice,* HAYNSWORTH, Chief Judge,** and RUSSELL, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

In December of 1970, the plaintiff-appellee, Edward Lee Bryan, opened a margin account with the defendant-appellant, Merrill Lynch, Pierce, Fenner & Smith, Inc. In a margin account, such as Bryan established with Merrill Lynch, the broker permits the customer to purchase stock or securities by the payment of an agreed percentage of the purchase price, leaving the stock as collateral for the balance due; on this balance, the broker charges interest. An important part of the agreement establishing such an account is the promise of the customer, in the event the stock purchased declines in value, to make additional payments or to

---

* Tom C. Clark, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation. Justice Clark died before the opinion was prepared.

** Because of the death of a member of Judge Haynsworth's family he was unable to be present at oral arguments. It was agreed by counsel that Judge Haynsworth should participate in the decision of this case on the briefs, the record and the tape of oral arguments.

furnish other acceptable collateral in order to maintain an agreed margin of protection against loss by the broker. When a decline in value of the stock purchased reaches the point that additional payments or collateral may be required, the broker makes what is known as a "margin," or "maintenance," call on the customer. Should the customer fail to meet such call, the broker may sell the stock in the account for his protection.[1]

Bryan was not an unsophisticated investor. He was a graduate of the United States Naval Academy and was a planner and a manager of Terminal product development with IBM until 1973 and was then employed by Terminal Communications in a similar role. He had purchased and sold stock for a number of years. During this period from December, 1970 to October, 1973, the plaintiff engaged in numerous transactions in his margin account. On October 12, 1973, the plaintiff had in his margin account, among other stocks, 2000 shares of AMIC stock. In response to an inquiry, the Account Executive in the Raleigh office of the defendant, who was handling on defendant's behalf the plaintiff's account, incorrectly informed the plaintiff that the status of his margin account was such that he could engage in a process known as "dollar for dollar substitution," whereby he could substitute 400 shares of Crouse Hinds stock for 600 shares of AMIC stock in his account, which had approximately the same value as the Crouse Hinds stock, without incurring a Regulation T call.[2] Acting on that information, the plaintiff directed the defendant to sell 600 shares of AMIC stock in his account and contemporaneously to purchase in "substitution" 400 shares of Crouse Hinds stock. When the transaction was effected, how-ever, the New York office of the defendant advised the local office that, under Regulation T, there could not be a "dollar for dollar substitution" in connection with the sale and purchase and that additional collateral or payment of the plaintiff would be required under Regulation T. The defendant's local Account Executive, LeFort, testified that on either Thursday evening, October 18, or Friday morning, October 19, he advised the plaintiff of the error and told him that the defendant would have to sell 200 shares of Crouse Hinds stock, thereby generating an amount sufficient to cancel the Regulation T call. LeFort testified he assumed from his conversation with the plaintiff that this was satisfactory to the plaintiff. On Friday, October 19, the defendant notified its New York office that the plaintiff did not want to meet the Regulation T call and to "bust out" 200 shares of Crouse Hinds stock. The plaintiff was informed of the completion of the transaction. The plaintiff, however, was not satisfied, and at his request a meeting with LeFort, defendant's acting Raleigh office manager and operations manager of the defendant was held on October 22. During this meeting the four men reviewed the transactions in the plaintiff's account leading up to the Crouse Hinds transaction, and the plaintiff was given a complete oral status report. Plaintiff specifically requested a written status report on the account, but LeFort said that it would have to come from New York. However, the defendant did agree, at the plaintiff's request, to rescind or "bust" the entire Crouse Hinds transaction so that the 600 shares of AMIC stock involved in the transaction would be returned to the plaintiff's margin account,

1. For definition of margin account, *see Liang v. Dean Witter & Co., Inc.* (1976), 176 U.S.App. D.C. 328, 540 F.2d 1107, 1109, n. 2; *Stephens v. Reynolds Securities, Inc.* (N.D.Ala.1976) 413 F.Supp. 50, *aff'd* (5 Cir.) 532 F.2d 1053.

2. The margin requirements for purchases of stock such as that purchased by Bryan are regulated by Regulation T of the Federal Reserve Board. To illustrate: If the Regulation T requirements for the downpayment by the customer are set at 65% of the purchase price, an investor who wishes to purchase additional stock in a margin account must transfer equity into his account in an amount equal to 65% of the purchase price of the stock, and the brokerage house will lend the investor the additional 35%. When the investor does not have 65% of the purchase price in his account when the transaction occurs, he is sent a bill, known as a "Regulation T call," for the amount necessary to equal 65%, and he must make payment within five working days.

while the remaining 200 shares of Crouse Hinds stock would be removed from the account.[3] As a result of this final action, the plaintiff was returned to his original position under which he held 2000 shares of AMIC stock and no shares of Crouse Hinds stock.

A few days after the October 22 meeting, the defendant's New York office issued its monthly statement of transactions in the plaintiff's margin account through October 26, 1973. This statement, received by the plaintiff in the middle of November, showed that 600 shares of AMIC stock had been sold and that 200 shares of Crouse Hinds stock had been purchased.[4] The plaintiff contacted LeFort about this discrepancy, and LeFort agreed that it was incorrect, due to the "busted trade" taking time to "head up." At that time the plaintiff again asked for a written report on the status of his account; LeFort replied that the back office was busy, but assured him that his account properly reflected at that time the ownership of 2000 shares of AMIC stock. As it turned out, the plaintiff did not actually receive a correct written report of the status of his account until he received his monthly statement for November sometime after December 3, 1973.

The plaintiff had also purchased on margin, at various periods prior to October 19, 1973, 2500 shares of Tally stock. As the market price of both the AMIC and Tally stocks declined in value after that date, plaintiff made additional purchases—1000 shares of Tally stock and 200 shares of Yates, also on margin, on November 1, and on November 16, 100 shares of AMIC stock, 300 shares of Tally stock and 100 shares of Yates stock on a cash account that plaintiff shared with his wife. The market price of the stocks continued to decline in value, however, and on November 21, the plaintiff sold from his margin account 100 shares of Tally stock, and on November 22, he from his cash account sold the 100 shares of AMIC stock, the 300 shares of Tally stock and the 100 shares of Yates stock. The decline in the stock market value continued unabated, and, on December 3, after the plaintiff indicated his inability to meet a maintenance call, his account was liquidated by the defendant.

A few days later the plaintiff asked LeFort why the last maintenance call had been so high, and LeFort replied that it was due to a "two dollar rule" [5] which applied to Tally stock. The plaintiff then said that he wished that he had known of the rule, because if he had he never would have bought the stock in the first place. Although the maintenance call was in fact higher because of the "two dollar rule," [6] the maintenance requirements on the stock in the plaintiff's margin account were such that the call would have been necessary even without the existence of the rule.

---

3. The defendant agreed to this rescission despite the fact that the market price of AMIC stock had increased and that of Crouse Hinds stock had decreased since the October 12 trade. As a result of this rescission, the defendant absorbed a loss of approximately $1,645.00.

4. It was defendant's practice to mail all customers monthly statements of their accounts. When these statements were closed a few days before the end of the month, as was often the case, they did not reflect transactions that may have taken place near the end of the period. In this case, the order for the rescission involving the purchase of 600 shares of AMIC stock and the sale of 200 shares of Crouse Hinds stock was put in by the Raleigh office on October 23. The delay that occurred between the time the order was put in and the time the effected transaction was actually picked up by the defendant's New York computers on October 30 is not developed in the evidence. At any rate,

when the plaintiff's monthly statement for October, which showed its closing date as October 26, was mailed to the plaintiff, the rescission was not shown.

5. The "two dollar rule" provides that an investor must maintain equity in his margin account which is at least as great as the current maintenance requirement, or two dollars a share, whichever is greater. Thus, for example, if the normal maintenance requirement for a certain stock is 50% and the two dollar rule also applies, the maintenance requirement for that stock at a $3.50 market value would be $2.00 rather than $1.75.

6. According to our calculations, the maintenance call of December 3, 1973 was for $7,035.53. Had the two dollar rule not applied, the call would have been for $3,754.28.

In his complaint, the plaintiff sets forth four counts: one, a federal action based on alleged violations of the Federal Securities Act;[7] another, a State action for fraudulent breach of contract; a third cause of action, sounding in negligence in the management of his margin account; and a fourth count, for punitive damages. He claimed damages attributable to the wilfulness and gross negligence of the defendant in the amount of $32,246.77. This figure was arrived at by selecting a settlement date of October 19, 1973 (seven days after the trade date of October 12, 1973, since seven days is the usual settlement date insofar as broker-dealers are concerned), figuring the excess of the value of the stocks in his margin account over the debit balance as of that date, resulting in a net figure of $23,027.38. To this amount was added $9,219.36 which plaintiff paid in margin calls in November, 1973, giving a claim of a $32,246.77 loss, which was allegedly attributable to the defendant.

The cause came on for trial before a jury. After the completion of the testimony, the district judge, on defendant's motion, dismissed the counts alleging violations of the Federal Securities Act and breach of contract but heard considerable argument on the right of the defendant to a directed verdict on the negligence claim.[8] This argument was directed primarily to the nature of plaintiff's negligence claim and to the manner in which that issue was to be submitted to the jury, if at all. In the course of such argument, plaintiff's counsel stated his theory of plaintiff's negligence case to be "that Merrill Lynch was negligent in failing to keep him [the plaintiff] sufficiently informed so that he could make an intelligent investment decision." He asked that the case be submitted to the jury on that basis. In elaborating on this theory of the case, plaintiff's counsel contended that, if the jury found that plaintiff did not have sufficient information of the correct status of his account on October 19, 1973, on which to make "an intelligent investment decision," then he was entitled to recover $32,246.77—the excess of the value of the stock in his account over the debit balance of his account as of October 19, plus the sum of the margin calls met by the plaintiff subsequent to that date. It was conceded at this point by plaintiff's counsel that the plaintiff had testified that, had he been in possession of an accurate written statement of his account on October 19, he was not certain whether he would have sold his stock[9] but urged that that was immaterial because the plaintiff would have been unable to make an "intelligent investment decision" without having in hand a written statement from the defendant showing accurately the stocks in his account. In commenting on this argument, the judge expressed difficulty with plaintiff's theory, particularly as it related to proximate cause and damages. He inquired of counsel for the plaintiff whether, if he accepted plaintiff's theory of his case, he would not have

7. Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a); Securities and Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b).

8. After the federal action was dismissed by the district court, the defendant made a motion to dismiss on jurisdictional grounds, contending that, since the basis for federal jurisdiction as stated in the plaintiff's complaint was the Federal Securities Act, the dismissal of that aspect of the case destroyed federal jurisdiction. The district judge overruled the motion without giving any reason. Presumably, he did so because he concluded either that diversity jurisdiction was sufficiently present or that the negligence claim could continue under the court's *pendent* jurisdiction. In any event, there is no appeal from this part of the district judge's rulings and federal diversity jurisdiction, at least, is obvious on the face of the complaint. Of course, as the district judge declared in his charge, the negligence claim was controlled by North Carolina law.

9. Later, before the case was submitted to the jury, counsel corrected this statement by asserting that the plaintiff had testified that, if he had known "the correct status of his account," he would have "immediately sold out as soon as possible and in any event within a week from the time of the first inception of the busted trade on October 12, 1973." However, we find no such statement in the record, and, in any event, the existence of such a statement on plaintiff's part, in light of the other evidence developed at trial, would not change the outcome of this case on appeal.

to include in his charge an instruction that, if the jury found that the plaintiff, due to the fault of the defendant, did not have the necessary accurate information in writing on which to make an "intelligent investment decision" to hold or sell the stock that should properly have been shown in his account on October 19, "then you [the jury] can decide that he [the plaintiff] would have been really smart and saved himself thirty-two thousand dollars ($32,000.00), [by selling then], or you may decide that he wouldn't have done anything different—in which case you would return a verdict of zero, or any amount in between." He went on to remark that he was uncertain about submitting the issue to the jury in that form because, as he phrased it, "[h]ow do we let a jury decide what he would have done when he [the plaintiff] doesn't know himself what he would have done?"

Following the argument, however, the judge overruled defendant's motion for a directed verdict and submitted the issue of negligence to the jury. In so doing, he again stated the plaintiff's theory on the basis of which he sought recovery: "* * * he (referring to plaintiff) contends that if he had known on October 19th or 20th or along in there what the facts were—*how much stock he owned, how much he owed*—that he would have sold out this A.M.I.C. and Tally, if he had realized they weren't going to ever give him a complete written statement until December * * * that he would have sold out." Later he instructed the jury that "*the only possible way that Bryan can recover from Merrill Lynch in this lawsuit is for you to be convinced from the evidence and by its greater weight that he, Mr. Bryan, lacked enough information—it doesn't matter whether it's oral or written—that he lacked enough information to intelligently decide what to do, and that if he had that information, he would have sold.*" In explaining how the jury should, if it determined that plaintiff should recover, compute damages, the judge stated that the jury should determine when, between October 19 and De-

cember 3, the plaintiff would have sold his stock had he known the status of his account. Based on these instructions, to which there were no exceptions, the jury returned a verdict in favor of the plaintiff in the amount of $19,500, a figure which could only be arrived at by an assumption on the part of the jury that the plaintiff would have on some unspecified date subsequent to October 19 sold the stock in his margin account.

■ The basic attack of the defendant on the judgment below relates to the denial of defendant's motion for a directed verdict because of insufficiency of evidence. In testing the evidence against the motion of the defendant for a directed verdict, we must on appeal do so on the basis of plaintiff's theory of his case, as refined by the district judge in his charge. In short, we must determine whether there was sufficient evidence to warrant the submission to the jury of the claim of the plaintiff that, as a proximate result of the defendant's allegedly negligent action, he "lacked enough information to intelligently decide what to do, and that if he had that information, he would have sold." If there was, the verdict of the jury should stand; if not, the judgment must be reversed.

■ The sufficiency of the evidence in a diversity case [10] is tested by federal standards, and those standards were stated by us in *Wratchford v. S. J. Groves & Sons Company* (4th Cir. 1969) 405 F.2d 1061, 1066. Such standard, as declared in *Wratchford*, is that if there is evidence from which an inference of liability may be deduced or if the evidence is equally susceptible of either of two inferences, one of which will support liability and the other not, the cause is for the jury. But it is an essential part of this rule that such inference or inferences be "within the range of reasonable probability," and if they are not but are "so tenuous that [they] rest[s] merely upon speculation and conjecture," it is "the duty of the court to withdraw the case from the jury." Applying that standard

---

**10.** See note 8, *supra*.

here, the motion of the defendant for a directed verdict should have been granted.

■ There is not a scintilla of evidence on which the jury in this case could base a finding that the plaintiff, had he had a written statement from the defendant of the exact number of shares of AMIC and Tally stock in his margin account, would have sold either or both of such stocks on October 19 or on any particular date thereafter. The plaintiff, in perfect candor, admitted that he did not know whether he would have sold if he had been in possession of such written information. In returning the verdict it did, the jury, under the instruction by which the district judge, by agreement of the parties, submitted the case, had to find that sometime after October 19 the plaintiff, if he had had a written statement of his account, would have sold his stock and, in addition, had to fix on some date when it was assumed the plaintiff would have sold the stock. This is true, because, as we have already observed, the district judge very pointedly told the jury that "the only possible way" that the plaintiff could recover would be that, if he had been informed the status of his margin account, "he would have sold" and that, if they found he would have sold, they should calculate his damages on the basis of the market value of his AMIC and Tally stock on the date on which they concluded he would have sold. But in finding for the plaintiff under this instruction, the jury was forced to pull out of the air some purely supposititious date identified by no shred of evidence in the record, on which it found the plaintiff would have sold his AMIC and Tally stock. The jury, in returning the verdict it did, had to arrive at an assumed date of sale entirely by "speculation and conjecture," unaided even by conjecture on the part of the plaintiff himself or by any other clue in the record. In fact, such evidence as there was would suggest that the plaintiff never at any time subsequent to October 19 considered selling his stock. There was assuredly nothing which would have prevented him from selling his Tally stock at any time, if he had ever intended to sell it. He knew exactly how many shares he owned. LeFort told him orally his status as to Tally stock; the defendant's written statement of account as of October 26 set forth accurately his ownership of Tally stock. The plaintiff simply did not want to sell either the Tally or the AMIC stock. This is plainly established by his purchases of additional Tally and AMIC stock subsequent to October 19 either in his own or in other accounts under his control.[11]

---

11. The plaintiff testified, as we have already noted, that had he known that his purchase of Tally stock was subject to a "two dollar" margin rule, he would not have purchased the stock in the first place. He did not learn of this "two dollar" rule, however, until several days after December 3, after his account was liquidated. Yet, the sole issue submitted, without objection, by the judge to the jury was whether the failure of the defendant to provide the plaintiff with a statement of "how much stock he owned, how much he owed" between October 19 and December 3 had prevented the plaintiff from making a rational determination whether to sell or not during that period. Certainly, something that the plaintiff only learned some days after December 3 could have had no bearing on the specific issue submitted to the jury, on which and on which alone the district judge instructed that defendant's liability in the case was to be resolved. Presumably, this was the reason the district judge did not include within his factual statement of the issue for the jury's consideration anything about the "two dollar" rule. The plaintiff did not except to the district judge's statement of the sole basis of liability on the part of the defendant as submitted to the jury for resolution and any claim in connection therewith is, therefore, not properly before us.

Even assuming, arguendo, that the claim were before us, we would be compelled to deny recovery, for there was lacking evidence upon which a jury could reasonably conclude that the defendant's failure to inform the plaintiff of the "two dollar rule" was the proximate cause of the plaintiff's losses in Tally stock. The maintenance requirements on the stock in the plaintiff's margin account were such that the December 3 maintenance call would have been necessary even without the existence of the "two dollar rule." And although the call was higher because of the rule, the plaintiff never alleged or testified that he would have been willing to meet the lower call which would have resulted had the "two dollar rule" not applied. Absent such proof, it cannot be said that the existence of the "two dollar" rule could have caused the plaintiff's loss on Tally stock. See, Williams v. Boulerice (1966) 268

It also cannot be said that he didn't know at all pertinent times that he had at least 1400 shares of AMIC stock. That ownership was stated on the written statement of account furnished him as of October 26 by the defendant. In addition, the Raleigh office was continuously representing to him that actually he had 2000 shares of AMIC stock that he could sell at any time he chose.[12] On November 22, he did sell 1000 shares of AMIC stock, thus evidencing that he was not prevented by anything the defendant did or did not do in liquidating his AMIC holdings. It is true this sale was made by the plaintiff only to satisfy a margin call but that cannot obscure the fact that the plaintiff recognized that he was free and at liberty at any time to sell all or any part of his AMIC holdings and had exercised that freedom. Under the plaintiff's cause of action as submitted to the jury, there was no basis other than the sheerest conjecture on which the jury could have concluded that the plaintiff's failure to liquidate his account resulted proximately from the defendant's allegedly negligent failure to provide him with information concerning the status of his margin account. This being the case, it cannot be said that the defendant's alleged negligence was the proximate cause of the plaintiff's stock losses. Accordingly, the judgment below is reversed with directions for the entry of judgment in favor of the defendant.

N.C. 62, 149 S.E.2d 590; *Nance v. Parks* (1966) 266 N.C. 206, 146 S.E.2d 24.

12. LeFort, plaintiff's Account Executive, gave unchallenged testimony to the effect that on several occasions, he reassured the plaintiff as to the correct status of his account. LeFort testified that on October 23, the day the rescission order was put in, "I told him [the plaintiff] that we were going to reinstate his positions," and in early November, he testified, "I told Mr. Bryan that the 'busted trade' was in effect done and as far as we were concerned it was done." Finally, in response to plaintiff's questions regarding the October statement of his account, LeFort testified that "I told him that it [the rescission] had been done." This testimony weakens substantially the plaintiff's claim that he lacked enough information regarding his account to decide intelligently what to do.