David ESTEP, Plaintiff,

v.

CHEMETALS CORPORATION, Defendant.

Civ. A. No. 81–0258–E(K).

United States District Court,
N.D. West Virginia,
Elkins Division.

Jan. 3, 1984.

Clark B. Frame, Morgantown, W.Va., and Ronald R. Brown, Kingwood, W.Va., for plaintiff.

Donald A. Wall, Cleveland, Ohio, and William M. Hanna and Edgar F. Heiskell, III, Morgantown, W.Va., for defendant.

## MEMORANDUM OPINION

KIDD, District Judge.

David Estep, hereinafter referred to as plaintiff, a resident of Kingwood, West Virginia, sued his employer, Chemetals Corporation, a Maryland Corporation, for damages on account of an injury he sustained while at work. The plaintiff was employed by the defendant corporation at its Kingwood, West Virginia plant, as a common laborer and began his employment with the defendant on July 5, 1979. This court has jurisdiction in this matter based upon diversity jurisdiction (28 U.S.C. § 1332). This matter came on for trial to the Court on December 12, 1983. After conclusion of all the evidence in this matter, the defendant made a motion for a directed verdict which the Court took under advisement.

Plaintiff was employed as a general laborer in the Manganese Plant operated by the defendant in Kingwood, West Virginia, and had worked approximately three weeks prior to his July 25, 1979, accident. The defendant's Kingwood Plant produces manganese metal by placing Manganese Oxide Ore and Calcium Fluoride into an electrolytic cell and heating the mix with an electrical current. As a result of this process, manganese metal is extracted from the ore and a by-product referred to as flux is produced. The molten flux is then tapped from the cell into a crucible referred to as a "flux pot" and the manganese metal is later tapped into a crucible referred to as a "metal pot."

On the day of his injury plaintiff was working in an outside area of the plant used for cooling flux pots. Plaintiff, as a probationary employee, was assigned to work with Keith O. Cramer. On the night of the accident, July 25, 1979, the plaintiff and Keith O. Cramer were assigned to cool the flux pots by using a hose and spraying the hot pots with water. Keith Cramer was asked by a co-worker, Rod Peasley, to assist Peasley in getting a door opened on a train car. Whereupon, Cramer left the "flux pot area" to assist Peasley. Cramer then returned to the work area where the plaintiff was using an industrial water hose to spray water in the flux pots to cool them. The plaintiff removed the hose from one pot and placed it in another when, at approximately 1:40 a.m., an explosion occurred. One of the flux pots had exploded which caused its contents of hot flux to be thrown for several yards. Cramer, by his testimony, indicated that his clothes caught fire and he ran approximately one hundred yards and then Cramer remembered David Estep and ran back toward the accident to find him. David Estep, plaintiff herein, sustained first and second degree burn injuries, which have healed, and serious injuries to his right eye and less severe injuries to his left eye.

There was contradictory testimony regarding whether there was a shortage of flux pots at this plant and also regarding the reasons for cooling the hot flux pots with water as opposed to allowing them to remain unused until they cooled through time. Loren Johnston, the plant superintendent who had been with the Company since 1968, testified that there was no shortage of flux pots nor any mention of a shortage and he would have been aware of such shortage if it were in fact the case. Regis Karcher, Manager of the Chemical Division and plant manager from 1974–1980, and David Thompson, Assistant Plant Manager from 1975–1980, testified that there was no shortage of flux pots. Testimony reveals that Chemetals began the use of water to cool flux pots in the early 1970's in order to facilitate beating of flux through the grizzle. Sometime in spring 1974, Chemetals changed their method of cooling flux pots from a laborer using an industrial hose to a sprinkler system. The sprinkler system allowed water to be sprayed over the pots which was a more time and cost efficient use of labor. How-

ever, due to icing problems and freezing of pipes, Chemetals abandoned this method in the winter of 1974 and reimplemented the previous method.

Testimony indicated that all employees were given a verbal induction and orientation session. A checklist of the orientation session of the plaintiff David Estep was introduced into evidence. The orientation checklist indicates that the plaintiff was issued a hard hat, glasses, mitt, dust mask and also provided with a printed pamphlet on safety instructions. Loren Johnston, Plant Superintendent, testified that he personally went through this checklist with the plaintiff. There was also testimony that two types of safety meetings were held. The Foremen's Safety Committee Meetings were attended by all foremen and any questions regarding safety hazards were discussed at this meeting. The Union Safety Committee Meeting was composed of representatives of labor and management who also discussed safety problems and recommendations. Testimony indicates that there was discussion in both meetings about some of the laborer's concerns of hot molten flux exploding when it was dumped onto the ground while hot. On March 26, 1979, there was discussion by the Foremen's Safety Committee, of a concern brought to their attention by a laborer, that the hosing down of flux pots might cause an explosion. On July 11, 1979, Terry Wiles submitted a concern to the Safety Committee about reminding laborers who worked around flux pots of their danger. There is no record or minutes kept of the discussions surrounding these or any other issues taken up at the Foremen's or Union's Safety Committee Meeting. However, testimony reveals that management did not think that there was any possibility of a flux pot exploding when water was poured over it for cooling. Therefore, the management did not feel any action needed to be taken. Testimony did indicate that only one sign was present at the plant's entrance advising employees to wear safety equipment but that no signs were present concerning the danger of flux pots exploding or other warning signs. Testi-

mony also indicates that inspectors from OSHA had made inspections of the plant and that there were no citations issued for violation of safety standards. Management employees, with approximately an average of 15 years experience each, testified that they had never seen nor knew of a flux pot exploding when it was cooled by hosing it down, or by use of the sprinkler system or by rain or snow directly impacting upon the pots. The facts reveal that there had not been an explosion of a hot flux pot in this manner until the July 25, 1979, incident. Witnesses for the plaintiff, including the plaintiff, testified that they had never heard of or seen such an explosion until this incident. Plaintiff further testified he never thought such an explosion could occur until this incident. While there was testimony that some employees were concerned with the propensity for danger in working with flux pots, there was no indication that the Union filed a grievance or that the Union Safety Committee took action once management had discounted the possibility of an explosion. Expert testimony by Jay Welsh, Director of Research at Chemetals since 1953, and a chemist who developed and patented the process at the Kingwood Plant, indicated that there would not be a chemical reaction between water and hot flux when water is poured over a flux pot. Welsh did indicate that steam would be created when water is placed upon a heated surface. He further indicated that an explosion of this nature could occur where a heavy object, which was wet, was placed in the molten flux and sank to the bottom. The defendant's witnesses are far more experienced, knowledgeable and highly qualified than plaintiff's witnesses, which must be taken into consideration, but the Court also recognizes the fact that these witnesses could have some interest in the outcome of this case.

Chapter 23, Article 2, Section 6 of the West Virginia Code gives employers who are subject to the West Virginia Workmen's Compensation Act immunity from

tort actions brought by employees for injuries sustained in the workplace.

Any employer subject to this chapter who shall subscribe and pay into the workmen's compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided, shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter.

Where the employee's injury is the result of deliberate intent of his employer to produce such injury or death, the Legislature provided a statutory exception permitting the employee to sue in tort:

Notwithstanding anything hereinbefore or hereinafter contained, no employee or dependent of any employee shall be entitled to receive any sum from the workmen's compensation fund, or to direct compensation from any employer making the election and receiving the permission mentioned in section nine [§ 23-2-9], article two of this chapter, or otherwise under the provisions of this chapter, on account of any personal injury to or death to any employee caused by a self-inflicted injury, willful misconduct, willful disobedience to such rules and regulations as may be adopted by the employer and approved by the commissioner of labor or director of the department of mines, and which rules and regulations have been and are kept posted in conspicuous places in and about the work, willful self-exposure in case of occupational pneumoconiosis or other occupational disease, as defined herein, or the intoxication of such employee, or the failure of such employee to use or make use of any protective or safety appliance or appliances prescribed by the commissioner and furnished by the employer for the use of or applicable to such employee. For the purpose of this chapter, the commissioner may cooperate with the state department of mines and the state department of labor in promoting general safety programs and in formulating rules and regulations to govern hazardous employments. If injury or death result to any employee from the *deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee shall have the privilege to take under this chapter, and shall also have cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter.*[1]

The statute provides that "deliberate intent" can only be shown if there is some actual, or specific intent to harm the employee by the employer.

The West Virginia Supreme Court of Appeals defined "deliberate intent":

In light of the foregoing discussion, the phrase "deliberate intent to produce such injury or death" must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort or wilful, wanton and reckless misconduct. *See Barr v. Curry,* 137 W.Va. 364, 71 S.E.2d 313 (1952); *Stone v. Rudolph,* 127 W.Va. 335, 32 S.E.2d 742 (1944); *see* 2 Restatement (Second) of Torts § 500-03 (1965). While wilful, wanton, and reckless misconduct are well-established concepts, we wish to make clear that we are using the words "wilful," "wanton," and "reckless" misconduct synonymously, and that the conduct removing the immunity bar must be undertaken with a knowledge and an appreciation of the high degree of risk of physical harm to another created thereby. *See* Restatement (Second) of Torts § 500, Comment at 587–88 (1965).

---

**1.** This Code Section was rewritten in 1982 after the *Mandolidis* decision.

*Mandolidis, et al. v. Elkins Industries Inc.*, 246 S.E.2d 907 at 914 (W.Va.1978) (footnotes omitted).

The West Virginia Supreme Court of Appeals in *Mandolidis v. Elkins, supra*, said that "intentional" means "that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."[2]

The law in West Virginia recognizes a distinction between negligence and reckless misconduct. The Court in *Tim Cline v. Joy Manufacturing Co.*, 310 S.E.2d 835 (W.Va.1983), held that:

> Acts amounting to negligence do not meet the *Mandolidis* test. Under *Mandolidis* it is essential in order to recover that the employer's misconduct must be of an intentional or wilful, wanton and reckless character, that the employer must have knowledge and appreciation of the high degree of risk of physical harm to another created by such misconduct, and, of course, that the employer's action must be the proximate cause of the injury.

■ The Fourth Circuit Court of Appeals held that wilful, wanton or reckless misconduct on the part of the employer was a standard different in kind from negligence, however gross the negligent conduct on the part of the employer. *See Smith v. ACF Industries, Inc.*, 687 F.2d 40, 42 (1982). The court went on to say that it was "conduct intentionally undertaken by the employer with knowledge that it created a high risk of physical harm to employees." In *Mandolidis v. Elkins, supra*, there was evidence that (1) there was a violation of federal and state safety laws; (2) a federal OSHA inspector had tagged the machines and ordered that they not be operated until the safety guards were put back; (3) the employer removed the safety guards on the saws to increase production; (4) that there were previous injuries to other employees due to lack of safety guards, and (5) a former employee was discharged because of his refusal to operate a saw without the safety guard. The employer was aware of the danger to his employees by operating the saw without safety guards but chose to do so in order to increase production. The employer in *Mandolidis* had a knowledge and appreciation of the danger and inherent risk involved but ignored the inevitable which certainly constitutes deliberate intent to injure. In *Littlejohn v. ACF Industries Corp.*, 556 F.Supp. 70 (1982), it was held that "an essential ingredient of wilful, wanton, and reckless misconduct under *Mandolidis* is that the perpetrator have both knowledge and an appreciation of the high degree of risk that his conduct will, by a strong probability, produce injury."[3] In order to come within the *Mandolidis* standard, plaintiff must show that "the employer knew that its employees were unreasonably exposed to great, recognized risks of serious harm." *Marshall v. Sisters of the Pallotine Missionary Society*, 703 F.2d 92, 94 (4th Cir.1983).

■ The plaintiff in this action has failed to meet the requisite standards for a *Mandolidis* action. There has not been a showing that the employer was aware of the possibility of an explosion as a result of cooling hot flux pots with a water hose. Further, evidence shows that the procedure utilized by the defendant to cool the hot flux pots was in continued use from 1970 through 1979, a period of nine years.[4] Until July 25, 1979, there had not been any injuries resulting from this procedure of cooling the flux pot. Further, testimony by officials of the defendant testified they did not have knowledge of the propensity

---

2. Taken from Restatement (Second) of Torts § 8A (1965).

3. The plaintiff averred that the defendant failed to adequately instruct and train him properly for his job. He claimed that the defendant failed to provide a safe place to work and inadequately instructed him in the proper use of the two way radio. The jury returned a verdict and the district court granted defendant's motion to set aside the verdict.

4. For a period of approximately one year the defendant used a sprinkler system, which was ceased in the winter of 1974. During the period that the sprinkler system was in use there were no explosions.

of the hot flux pots to explode when water was sprayed upon them. In fact, plaintiffs also testified that they had no knowledge, prior to this incident, of a danger in this process. While some of the employees presented their concerns to the Foremen's and Union's Safety Committee Meetings, they did not pursue their concerns after the respective Committees failed to act. Further, the employees could have availed themselves of the opportunity to file a grievance if they felt management was not addressing their concerns. Testimony revealed that OSHA inspectors had visited the Kingwood Plant but had not issued citations or found any safety violation regarding the method used to cool flux pots.

The employer may have been negligent in not providing better protection, such as safety signs, better protective clothing, and specific warnings as to flux pots, but such failure tends to prove negligence in some degree, but it does not constitute intentional and recognized risk of serious harm under the standards of *Mandolidis*.

Based upon the testimony and evidence introduced in the trial of this matter and the conclusions herein, the Court is of the opinion that judgment should be entered in favor of the defendant and against the plaintiff, David Estep.

Judgment shall be granted accordingly.