Sherman L. HANDLEY and Linda L. Handley, Plaintiffs,

v.

UNION CARBIDE CORPORATION, Defendant.

Civ. A. No. 84–2270.

United States District Court, S.D. West Virginia, Charleston Division.

Oct. 17, 1985.

See also 622 F.Supp. 1065.

Alfred B. McCuskey, II, St. Albans, W.Va., for plaintiffs.

W.T. Shaffer, Jackson, Kelly, Holt & O'Farrell, Charleston, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This is a *Mandolidis*-type[1] action brought under the workers' compensation

---

1. *Mandolidis v. Elkins Industries, Inc.,* 161 W.Va. 695, 246 S.E.2d 907 (1978). Suits by employees against their employers have come to be known popularly as *Mandolidis* actions.

laws of the State of West Virginia. *W.Va. Code*, § 23–4–2.[2] That section of the *Code* was extensively amended in 1983. This action arises under the amended version.

The trial was bifurcated pursuant to the holding of *Mooney v. Eastern Associated Coal Corp.*, 326 S.E.2d 427 (W.Va.1984).[3] Trial on the issue of liability was held the week of August 5, 1985. At the conclusion of the Plaintiffs' case and again at the close of all the evidence, the Defendant moved for a directed verdict. The Court reserved ruling on the motion pending submission of the case to the jury. The jury returned a verdict in favor of the Plaintiffs. The Defendant now brings before the Court a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. Inasmuch as the Court's ruling on the motion for judgment n.o.v. is dispositive of the case, the Court will not address the Defendant's companion motion for a new trial.

## I. *Background*

The Plaintiff, Sherman Handley,[4] worked at Union Carbide from April 20, 1981, to August 1, 1984. He worked in the Specialty Catalyst Unit (Building 156) as a chemical operator at Carbide's plant in South Charleston, West Virginia.

As a chemical operator at Carbide, Handley's duties included transferring chemicals in and about Building 156. Frequently, railroad tanker cars or tanker trucks (tankers) would bring chemicals into the plant. Handley and others would then transfer the chemicals from the tankers to storage tanks near Building 156. The transfer was accomplished by the use of hoses, siphons, drums and piston pumps. The Carbide employees would connect hoses to the tankers and pump the chemicals to the storage tanks. They would also move the chemicals to tanks where "blends" were made of chemicals. This blending involved mixing several chemicals together pursuant to a "recipe."

On or about January 18, 1984, Handley began to experience problems in breathing. [R.Vol. 1, 47]. He also became exhausted after climbing stairs. [R.Vol. 1, 54]. He was first diagnosed as having pneumonia. [R.Vol. 1, 50]. After treatment for pneumonia and bed rest produced no relief from his symptoms, he was admitted to an area hospital. There, diagnosis was made of schleroderma.[5] Schleroderma is a rare lung disease which, because of scar tissue on the lungs, diminishes the amount of oxygen which is processed by the lungs. [R.Vol. 1, 56]. As a result, Handley must at all times be tethered to an external supply of oxygen. [R.Vol. 4, 52]

Handley brought suit against Carbide on July 9, 1984, claiming that the company had acted with deliberate intent, as defined in *W.Va.Code*, § 23–4–2, in causing the disease which he now suffers.

## II. *Standard of Review*

■ Before turning to the merits of this case, a few comments must be made as to this Court's role and standard of review in regard to a motion for judgment notwithstanding the verdict. A judgment n.o.v. is,

**2.** Paragraph (b) of § 23–4–2 provides as follows: "If injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee shall have the privilege to take under this chapter, and shall have cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter."

**3.** In *Mooney* the West Virginia Supreme Court held that trials of Mandolidis actions should be bifurcated. "The first part of the trial would decide liability and damages under *Mandolidis*,

and the second phase would decide the worker's compensation benefits offset received by the plaintiff." *Mooney* at 433. In the present case, the trial would have been bifurcated in any event because the Worker's Compensation Commission has yet to make a determination concerning an award.

**4.** The Plaintiff's wife, Linda Handley, joined in the suit. She sought damages for loss of consortium; hence, she did not testify during the liability portion of the trial.

**5.** Schleroderma is also referred to as systemic sclerosis. [R.Vol. 4, 30].

in essence, a delayed directed verdict.[6] The standard in passing on a motion for judgment n.o.v. is the same as a motion for directed verdict.[7] Indeed, a motion for judgment n.o.v. cannot be granted if one for a directed verdict could not have been granted. A court's motivation for delaying a ruling on the directed verdict motion can be placed under the heading of judicial economy. Although it will appear proper in many cases to direct a verdict, in a close case, if that ruling is reversed on appeal, the entire case must be retried. On the other hand, if the case is submitted to the jury and its verdict nullified by the Court, a reversal on appeal will only necessitate a reinstatement of the original jury verdict.[8]

■ Motions for judgment n.o.v. should be sparingly granted.[9] In reviewing the motion, a court should not retry the case or replace the jury's decision with its own. Neither should the Court determine the credibility of witnesses nor weigh the evidence generally.[10] Rather, the Court should only determine whether there was sufficient evidence for the matter to have gone to the jury in the first instance.

The Defendant, Union Carbide, urges this Court to adopt a heightened standard in determining whether a jury verdict is supported by "sufficient evidence." As support for a higher standard, Carbide cites the language of *W. Va. Code*, § 23-4-2(c)(2)(iii)(B), which language reveals a legislative preference for summary judgments and directed verdicts in this type of action:

"Notwithstanding any other provision of law or rule to the contrary, and consistent with the legislative findings of intent to promote prompt judicial resolution of issues of immunity from litigation under this chapter, the Court shall dismiss the action upon motion for summary judgment if it shall find, pursuant to *Rule* 56 of the Rules of Civil Procedure that one or more of the facts required to be proven by [this statute] do not exist, and the Court shall dismiss the action upon a timely motion for a directed verdict

**6.** *Rule* 50(b) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

"Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than ten days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict...."

**7.** *Armstrong v. Republic Realty Mortgage Corp.,* 631 F.2d 1344 (8th Cir.1980); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250 (5th Cir.1980); *California Computer Products, Inc. v. IBM Corporation,* 613 F.2d 727 (9th Cir. 1979); *Vander Zee v. Karabatsos,* 589 F.2d 723 (D.C.Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979); *Yazzie v. Sullivent,* 561 F.2d 183 (10th Cir.1977); *Dulin v. Circle F Industries, Inc.,* 558 F.2d 456 (8th Cir. 1977); *Moran v. Raymond Corporation,* 484 F.2d 1008 (7th Cir.1973); *Law v. Virginia Stage Lines, Inc.,* 444 F.2d 990 (D.C.Cir.1971).

**8.** The Second Circuit is especially explicit in its preference for this approach:

"We have in the past cautioned trial judges that it is preferable, 'in the best interest of efficient judicial administration,' to refrain from granting a motion for a directed verdict and instead to allow the case to be decided—at least in the first instance—by the jury. [cite omitted] Pursuant to the recommended practice, if the jury reaches what the judge considers to be an irrational verdict, the judge may grant a motion for judgment notwithstanding the verdict. If this ruling is reversed on appeal, the jury's verdict may simply be reinstated. If, however, a verdict has been directed and that ruling is reversed on appeal, and entire new trial must be held." *Konik v. Champlain Valley Physicians Hospital,* 733 F.2d 1007, 1013 n. 4 (2d Cir.1984).

While this Court accepts the teaching of the Second Circuit as it pertains to the circumstances of this case, the Court is reluctant to replace generally the directed verdict with the judgment n.o.v. In many instances a court will not need time to deliberately review the evidence and can confidently direct a verdict at the close of the evidence. To repeatedly nullify jury verdicts is to invite disrespect and cynicism for our jury system.

**9.** *Jeanes v. Milner,* 428 F.2d 598, 601 (8th Cir. 1970); *Webb v. Harvell,* 563 F.Supp. 172, 177 (D.C.Ark.1983).

**10.** *Nationwide Mutual Ins. Co. v. McLaughlin,* 429 F.2d 1317 (4th Cir.1970); *Simblest v. Maynard,* 427 F.2d 1 (2d Cir.1970).

against the plaintiff if after considering all the evidence and every inference legitimately and reasonably raised thereby most favorably to the plaintiff, the Court shall determine that there is not sufficient evidence to find each and every one of the facts required to be proven by [this statute]." [11]

From this language, Carbide would have the Court adopt a standard which would require a lesser showing to successfully move for a judgment n.o.v. There are two problems with the Defendant's argument.

First, in urging "higher" or "lesser" burdens on the respective parties, Carbide would have the Court believe that existing procedural standards on judgment n.o.v. motions [12] are somehow changed by the statute's wording. The Court concludes otherwise. The statute speaks of "sufficient evidence," but it does not propose a formula for determining what is sufficient. Nevertheless, the Court opines that the Plaintiff's burden has increased because of the amended statute, but it is a burden imposed substantively rather than procedurally. A plaintiff suing under the "deliberate intent" exception to West Virginia's worker's compensation laws may [13] have to prove five independent facts [14] to recover. The "sufficiency test" cannot be said to have changed; rather, it is the nature of the evidence to which the test will be applied which has changed. In other words, because a defendant may have to prove five independent and narrowly drawn elements, directed verdicts and judgments n.o.v. may be appropriate more frequently.

Second, in any event, both the Defendant and the Plaintiff ignore the principle that, in a diversity action such as this, federal law sets the standard for the sufficiency of the evidence.[15] In federal courts it has been said time and again that more than a mere scintilla of evidence is required to send an issue to the jury.[16] The test has been phrased as one of whether there is "substantial evidence supporting the verdict." *Millers Mutual Ins. Association of Illinois v. Southern Railway Corp.,* 483 F.2d 1044, 1046 (4th Cir.1973) (*quoting* C. Wright, *Law of Federal Courts,* § 95, at 425 (2d Ed.1970)). Substantial evidence in turn has been defined as "evidence of such quality and weight that reasonable and

**11.** This is a significant change brought about by the new statute. In *Mandolidis* the court indicated a general disapproval of disposition by summary judgment or motion to dismiss.

"We are of the view that complicated industrial 'accidents,' wherein the state of mind of company representatives is critical, seldom lend themselves to disposition by summary judgment, and where there is any doubt such a motion should be refused." *Mandolidis,* 246 S.E.2d at 918.

**12.** The statute does not explicitly refer to motions for judgment n.o.v., but the standard is the same as that applied to a motion for directed verdict. *See, supra,* n. 7.

**13.** The Court uses "may" because of the alternate standards for finding deliberate intent employed in *W.Va.Code,* § 23–4–2. In the easiest case, say physical assault, Plaintiff would not have to invoke the standard containing five elements.

**14.** The statute uses the term "fact." For purposes of clarity, this Court will use the term "element" in referring to the five "facts" which must be proven under *W.Va.Code,* § 23–4–2(c)(2)(ii).

**15.** *Fitzgerald v. Manning,* 679 F.2d 341 (4th Cir. 1982); *Bryan v. Merrill-Lynch, Pierce, Fenner & Smith,* 565 F.2d 276 (4th Cir.1977); *Millers Mutual Ins. Association of Illinois v. Southern Railway Corp.,* 483 F.2d 1044 (4th Cir.1973); *Hunter v. Seaboard Coastline Railroad Co.,* 443 F.2d 1319 (4th Cir.1971); *Brant v. Robinson Inv. Co.,* 435 F.2d 1345 (4th Cir.1971); *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d 1061 (4th Cir.1969); *cf. Calhoun v. Honda Motor Co.,* 738 F.2d 126 (6th Cir.1984); *F.W. Hempel & Co. v. Metal World, Inc.,* 721 F.2d 610 (7th Cir.1983).

**16.** *Worsham v. A.H. Robins Co.,* 734 F.2d 676 (11th Cir.1984); *Schultz v. Owens-Illinois, Inc.,* 696 F.2d 505, 511 (7th Cir.1982); *Hardin v. Manitowoc-Fortsythe Corp.,* 691 F.2d 449 (10th Cir.1982); *Doucet v. Diamond M Drilling Co.,* 683 F.2d 886, *rehearing denied* 689 F.2d 190 (5th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *Smith Machine Co. v. Jenkins,* 654 F.2d 693 (10th Cir.1981); *Liberty Leather Corp. v. Callum,* 653 F.2d 694 (1st Cir. 1981); *Patrick v. South Central Bell Telephone Co.,* 641 F.2d 1192 (6th Cir.1980); *Gehrhardt v. General Motors Corp.,* 581 F.2d 7 (2d Cir.1978); *Patzig v. O'Neil,* 577 F.2d 841 (3d Cir.1978); *Beaty Shopping Center, Inc. v. Monarch Ins. Co. of Ohio,* 315 F.2d 467 (4th Cir.1963).

fair-minded [people] in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party...." *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888, 891 (4th Cir.1980). This would appear to be the test in federal court.

The Court notes that the principle that federal law controls on this procedural point may not compel a decision divergent from what state law would produce. *Dick v. New York Life Ins. Co.,* 359 U.S. 437, 79 S.Ct. 921, 3 L.Ed.2d 935 (1959). Although the authority is not as abundant as the federal, the West Virginia test would also appear to rest on a "reasonable person" standard. *Morgan v. Bottome,* 289 S.E.2d 469 (W.Va.1982). Rounding out the state court's role is the directive found in *W.Va. Code,* § 23–4–2(c)(2)(iii)(B) for the Court to consider "all the evidence" and "every inference legitimately and reasonably raised thereby most favorably to the plaintiff." Again, these two directives would not mark the state process as different than that to be employed by a federal court. Under federal procedural law, a federal court will also consider all the evidence [17] and give the nonmoving party the benefit of all legitimate inferences.[18]

### III. *The Statute*

■ The West Virginia Worker's Compensation Act is similar to that of many states. It was enacted as a response to the many perceived inequities suffered by workers under the common law tort system. Under the worker's compensation system, fault has been removed as a mate-rial element. Whether an employer or an employee is negligent is immaterial; an employee receives compensation in either event. The bargain for both sides of the economic picture is appealing: the employee recovers even when he is at fault and the employer is given immunity from a common-law tort action.

From its inception, the Worker's Compensation Act contained an exception to the employer's litigation immunity: if the employer acted with the "deliberate intention" to injure an employee, that employee could bring suit "as if this chapter had not been enacted." *W.Va.Code,* § 23–4–2(b). In 1978, in the now famous *Mandolidis* decision, the West Virginia Supreme Court of Appeals defined "deliberate intention" within the meaning of the Worker's Compensation Act as including willful, wanton and reckless misconduct.[19] *Mandolidis v. Elkins Industries, Inc.,* 161 W.Va. 695, 246 S.E.2d 907 (1978). In the wake of this influential case, much interest was generated in the business and legal communities to seek a legislative alteration of the decision. In 1983 the Legislature acted to amend *W.Va.Code,* § 23–4–2, substantially rewriting the section (hereinafter the former statute and the amended statute will be referred to as "old statute" and "new statute," respectively).

Under the old statute—as affected by the *Mandolidis* decision—an employee could fall under the "deliberate intent" exception by showing conduct such as a direct physical assault, or by showing willful, wanton or reckless misconduct.[20] The

---

17. *Quaker City Gear Works, Inc. v. Skil Corp.,* 747 F.2d 1446 (Fed.Cir.1984); *Evington v. Forbes,* 742 F.2d 834 (4th Cir.1984); *Boutros v. Riggs National Bank D.C.,* 655 F.2d 1257 (D.C. Cir.1981); *Wyatt v. Interstate & Ocean Transport Co.,* 623 F.2d 888 (4th Cir.1980).

18. *Villanueva v. George,* 659 F.2d 851 (8th Cir. 1981); *Bryan v. Merrill-Lynch, Pierce, Fenner & Smith,* 565 F.2d 276 (4th Cir.1977); *Millers Mutual Ins. Association of Illinois v. Southern Railway Corp.,* 483 F.2d 1044 (4th Cir.1973); *Hunter v. Seaboard Coastline Railroad Co.,* 443 F.2d 1319 (4th Cir.1971); *Shelton v. Jones,* 356 F.2d 426 (4th Cir.1966); *McClure v. Price,* 300 F.2d 538 (4th Cir.1962).

19. The *Mandolidis* Court summarized its position as follows:

"In our view when death or injury results from willful, wanton or reckless misconduct such death or injury is no longer accidental in any meaningful sense of the word, and must be taken as having been inflicted with deliberate intention for the purpose of the Workmen's Compensation Act."
*Mandolidis,* 246 S.E.2d 907 at 914.

20. Justice McGraw has pointed out the two prongs under the old statute after *Mandolidis:*

"Although 'deliberate intent' to injury [sic] may manifest itself in the form of a direct physical assault, both *Mandolidis* and *Cline*

West Virginia Supreme Court summarized the *Mandolidis* test—the judicially created second prong of the "deliberate intent" exception—in *Cline v. Joy Mfg. Co.*, 310 S.E.2d 835 (W.Va.1983).

> "Under *Mandolidis* it is essential, in order for an injured employee to recover, that the employer's misconduct must be of an intentional or willful, wanton and reckless character, that the employer must have knowledge and appreciation of the high degree of risk of physical harm to another created by such misconduct, and, of course, that the employer's action must be the proximate cause of the injury."

*Id.* at 838. It was this judicially created second prong which excited the business community. Hence, it was this area which the Legislature addressed.

The new statute expressly provides that "the Legislature intended to create a legislative standard for loss of [tort] immunity of more narrow application and containing more specific mandatory elements than the common law tort system concept and standard of willful, wanton and reckless misconduct." *W.Va.Code*, § 23–4–2(c)(1). To fulfill this legislative desire, the new statute contains five tightly drawn elements which must be proven before an employer will lose its immunity. This legislative "second prong"[21] which supplants the *Mandolidis* test consists of the following:

> "(A) That a specific unsafe working condition existed in the work place which presented a high degree of risk and a strong probability of serious injury or death;
>
> (B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;
>
> (C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe work places, equipment or working conditions;
>
> (D) Notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working conditions intentionally; and
>
> (E) That such employer so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition."

*W.Va.Code*, § 23–4–2(c)(2)(ii).

This Court is of the opinion that these five elements were not chosen in a vacuum. In fact, they appear to be drawn from the facts in the *Mandolidis* case itself. The *Mandolidis* case has been characterized as

---

recognize that 'willful, wanton and reckless' conduct on the part of the employer resulting in injury to an employee will support a tort recovery."
*Kane v. Corning Glass Works*, 331 S.E.2d 807, 812 (W.Va.1984) (McGraw, J., dissenting).

**21.** The first prong under the new statute reads as follows:

> "(2) The immunity from suit provided under this section and under section 6–(a) [§ 23–2–6(a)], article 2 of this chapter, may be lost only if the employer or person against whom liability is asserted acted with 'deliberate intention.' This requirement may be satisfied only if:

> (i) it is proved that such employer or person against whom liability is asserted acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee. This standard requires a showing of an actual, specific intent and may not be satisfied by allegation or proof of (A) conduct which produces a result that was not specifically intended; (B) conduct which constitutes negligence, no matter how gross or aggravated; or (C) willful, wanton or reckless misconduct."

*W.Va.Code*, § 23–4–2(c)(2).

containing a "compelling state of facts." *Kane* at 809. In his dissenting opinion to *Kane*, Justice McGraw agreed that the facts of *Mandolidis* were compelling, but he disagreed "with the [majority's] implication that an identical or worse set of circumstances is essential to recover under the willful, wanton, and reckless misconduct standard." *Kane* at 812 (McGraw, J., dissenting). Justice McGraw was writing more than a year after the 1983 amendments had added the five-element test. *Kane* was decided under the old statute; therefore, Justice McGraw did not express a view as to whether the Legislature had also adopted the facts, if not the law, in *Mandolidis* as the measuring criteria. Review of the facts in *Mandolidis* reveals that such an adoption may have provided the genesis of the Legislature's intent.[22]

The pertinent facts of *Mandolidis* were summarized succinctly by Judge Haynsworth in *Smith v. ACF Industries, Inc.*, 687 F.2d 40 (4th Cir.1982):

"Mandolidis was an operator of a table saw in a wood working plant. He lost two of his fingers and a portion of his hand due to the fact that the saw was unequipped with a safety guard. There was evidence that the employer had removed the safety guards from the table saws for the stated reasons that their presence tended to slow production. Operation of the saw without the safety guard was a violation of both federal and state standards. A federal OSHA inspector had tagged the machines and ordered them out of operation, but the employer removed the tags and continued the operation without the safety guards. There had been previous injuries to other employees from unguarded saws, and a former employee had been discharged for refusing to operate a saw without the guard. Protesting employees were given to understand that a refusal to operate an unguarded saw would result in their being sent home or discharged. When one witness spoke to the

plant manager about the plaintiff's injuries due to the absence of a guard, the manager was said to have responded 'So what?' 'He's getting compensation.'"

These facts clearly would have met the five-element test employed by the new statute. Thus, it is against this background that the new statute must be examined. Admittedly, every case will differ in its facts, but the facts of *Mandolidis*, presaging so closely the test of the new statute as they do, establish a clear example of the type of conduct the Legislature wished to make actionable under the new statute.

### IV. *Applying the New Statute to the Instant Litigation*

The evidence presented in this case was quite confusing. Aside from the complicated nature of the subject matter (unfamiliar chemicals and chemical processes), the evidence was adduced in a disorderly fashion. Issues were addressed, apparently abandoned, and then readdressed. Despite the complexity and disjointed presentation, the root of any confusion arises from the Plaintiffs' choice of operative facts. Handley did not attempt to prove the existence of merely one specific unsafe condition at the Carbide facility; he attempted to prove that there were several such conditions. This approach can be contrasted with prior *Mandolidis*-type actions where attention was focused on only one piece of equipment, *Smith v. ACF Industries, Inc.*, 687 F.2d 40 (4th Cir.1982); *Belcher v. J.H. Fletcher & Co.*, 498 F.Supp. 629 (S.D.W.Va. 1980); *Kane v. Corning Glass Works*, 331 S.E.2d 807 (W.Va.1984); *Cline v. Joy Mfg. Co.*, 310 S.E.2d 835 (W.Va.1983); *Mandolidis v. Elkins Industries*, 161 W.Va. 695, 246 S.E.2d 907 (1978), one particular unsafe working condition, *Marshall v. Sisters of the Pallotine Missionary Society*, 703 F.2d 92 (4th Cir.1983); *Nedley v. Consolidation Coal Co.*, 578 F.Supp. 1528 (N.D.W.Va. 1984), or one isolated accident or event, *Estep v. Chemetals Corp.*, 580 F.Supp. 254

---

**22.** As most practitioners realize, there is inherent difficulty in ascertaining the intent of the West Virginia Legislature because its published proceedings do not contain formal legislative history such as a record of committee debate.

(N.D.W.Va.1984); *Littlejohn v. ACF Industries Corp.*, 556 F.Supp. 70 (S.D.W.Va. 1982).

■ Carbide argues that Handley attempted to paint the chemical industry as inherently unsafe. It argues that the evidence was of unsafe working conditions generally instead of proving a specific unsafe working condition. The Court agrees with the Defendant's base contention that the new statute does not abrogate immunity for employers who engage in objectively hazardous enterprises such as coal mining or chemical production. On the other hand, there is nothing to prevent a plaintiff from alleging and attempting to prove that there was more than one specific unsafe working condition present in the work place. Such a strategy might appear to increase a plaintiff's opportunities for success; it also measurably compounds his burden of production and proof. More significantly—at least for the trier of fact—this attack on several fronts, or shotgun proof scheme, can lead to confusion and unreliable results.

■ The Court agrees further with the argument of Carbide that for each specific unsafe working condition adduced, Handley had to prove each of the five elements set forth under the second prong of the new statute. In other words, he could not prove element number one applicable to one condition, element number two applicable to another, and so on. All five elements must be proven for each unsafe condition, or any one unsafe condition before liability may be put to the jury.

The Plaintiffs attempted at trial to prove several unsafe working conditions, most involving the handling of certain chemicals. These included silicon tetrachloride, dimethylethanolamine (DMEA), sulfur trioxide, metaphenylenediamine and amines (a general term comprising a group of chemicals). The Plaintiffs also urged that the disrepair of the scrubber on the ethyl silicate process was an unsafe condition. An examination of the Plaintiffs' evidence reveals that in some instances the alleged unsafe working condition associated with a chemical can

itself be divided into a subset of two or more specific working conditions. Each of these subconditions must be scrutinized in light of the five elements.

As a further matter it must be noted that the five elements in the new statute are in some respects independent, in others interdependent. On the one hand, it is manifest that proof of all five elements be shown in order for a plaintiff to recover. On the other hand, proof of one element may be essential for sufficient proof of another element. For example, an employer cannot be said to have a subjective realization (element number two) of a specific unsafe working condition (element number one) if the very existence of such condition has not been proven.

At the risk of being repetitious in analyzing the applicable law, the Court now turns to each working condition identified by the Plaintiffs to see if there was sufficient evidence produced to support each of the five vital elements.

### A. *Silicon Tetrachloride.*

This chemical was not produced at Carbide. [R.Vol. 2, 48]. It was imported from other manufacturers in either tank trucks or tank cars. At Carbide it was placed in storage tanks and then transferred into a reactor inside Building 156. The chemical was then reacted with ethanol to produce ethyl silicate.

The Plaintiffs consumed much time describing the process by which the silicon tetrachloride was transferred from the tankers to the storage tanks. Basically, workers connected one end of a hose to the tanker and the other end to a pipe leading to the storage units. The line was pressurized with nitrogen to check for leaks; then the tanker was pressurized to force the chemical through the hose. [R.Vol. 1, 98]. After the chemical was transferred, the hoses and tankers then were purged with nitrogen. Several workers testified that spills of silicon tetrachloride almost always occurred when the hoses were unhooked. [R.Vol. 1, 31 and Vol. 2, 39]. The spills

were never large, but they created vapors. [R.Vol. 2, 41]. Silicon tetrachloride reacts with water. [R.Vol. 3, 11]. When spilled, moisture in the air causes the chemical to "smoke," i.e., give off hydrochloric acid vapors. [R.Vol. 5, 28]. The vapor is white and can be seen. [R.Vol. 1, 90]. To clean up the spilled silicon tetrachloride, the workers sprayed water on the spill. [R.Vol. 2, 42]. The water "knocks down" the vapors and carries the hydrochloric acid into Carbide's sewer. [R.Vol. 1, 90].

At this point, the Court notes that the evidence relating to the unloading and transferring of silicon tetrachloride touches upon two specific working conditions, rather than one. First, there is the unloading procedure itself—the hooking and unhooking of hoses to the tankers. Second, the sewering of the spilled silicon tetrachloride must be considered a separate working condition also. In making this division, the Court notes that it is given no express guidance by the statute as to the characteristics which will mark a working condition as "specific." The Court, however, is persuaded by the statutory element which concerns itself with violations of a governmental regulation or industry safety standard. This element indicates that a working condition cannot be so narrowly defined as to escape the attention of governmental regulations or industry standards. In other words, it must be identified to the extent that, isolated from the rest of the work place, it is apt to possess its own distinct collection of procedures related to safety. As a parallel concept, the specific working condition should present a possible risk of injury which can be perceived within definite parameters. For example, the table saw in *Mandolidis* represented a specific unsafe working condition. If it had been part of a multiple piece assembly line, the assembly line could not be said to constitute the specific working condition; the table saw itself sufficiently supplied the elements of safety and danger. Naturally, the scope and features of a specific working condition will depend greatly upon the complexity and nature of the work place. In this case, the Court is influenced by the

silicon tetrachloride safety sheet introduced by the Plaintiffs. The Plaintiffs sought to show an industry standard applicable to the silicon tetrachloride spills. Although it may not establish an industry standard, it does demonstrate the appropriateness of considering the sewering of the silicon tetrachloride spills as a separate specific working condition.

■ The Court finds that there was substantial evidence upon which a jury could have found that the unloading of silicon tetrachloride was an unsafe working condition which presented a high degree of risk and a strong probability of serious injury or death. The evidence was clear that vapors were often created during the unloading process and that the workers had to run away from those vapors. They ran because they knew that it was unwise to breathe the vapors. The Plaintiffs' expert witness, Dr. Owens, testified that when silicon tetrachloride reacts with water, such as the moisture in the air, it breaks down into silica and hydrochloric acid. Silica particles, if inhaled, can cause scarring of the lungs—sclerosis or schleroderma. [R.Vol. 4, 59].

On the other hand, the evidence is insufficient to reach the further conclusion that spraying water on the silicon tetrachloride vapors was itself an unsafe working condition. Whereas, employee Darrell Harold testified that he breathed the silicon vapors about every time he hooked up or disconnected the hose on the tankers [R.Vol. 3, 54], there was no evidence of a similar peril to the workers cleaning up the spills. The workers unhooking the hoses were very near the chemicals. The workers with the water hoses, however, were at a distance from vapors which all agreed could be seen in isolation. [R.Vol. 1, 90].

The second element in the statutory test requires proof that the employer had a subjective realization and an appreciation of the existence of the specific unsafe condition and of the risk of injury. The question here goes only to the unloading process, since the process of spraying water

on the silicon tetrachloride was not shown to be an unsafe working condition. As to the unloading, which included unhooking the hoses from which small amounts of silicon tetrachloride would spill, the Court finds that there was sufficient evidence to support the jury's conclusion that Carbide knew of the dangers involved in unloading the chemical.

Carbide spends much effort arguing that it could not have had an appreciation of the risk of schleroderma when the medical community itself is divided into three schools of thought on the disease. Although it is by no means an easy question, the Court is not convinced that Carbide had to know that exposure to silicon tetrachloride would cause *schleroderma.* The Court realizes that Carbide may be implying that the history of uncertainty as to schleroderma is illustrative of the unknown dangers in a broader sense. Nonetheless, the Court feels compelled to defer to the jury's judgment on this matter given the testimony on the dangers of silicon tetrachloride.[23]

The Court now reviews the weakest portion of the Plaintiffs' case, and it is a weakness which permeates all of the alleged unsafe working conditions advanced by the Plaintiffs. The Plaintiffs are required to prove that Carbide violated either a government regulation or an industry standard. There was absolutely no evidence produced that Carbide had violated "a state or federal safety statute, rule or regulation, whether cited or not." Indeed, the Plaintiffs concede that they must rely upon a violation of "a commonly accepted and well-known safety standard within the [chemical industry]." Their proof and theory on this point, however, are tenuous at best.

The Plaintiffs presented no industry standard on the proper method of transporting chemicals such as silicon tetrachloride from tankers to the chemical facili-

ty. It is logical to assume that other chemical companies carried out similar operations. The record, however, is barren on the subject.

On the procedure for "sewering" the spilled silicon tetrachloride, the Plaintiffs attempted to show what they called an "industry standard." They introduced into evidence a one-page Carbide safety sheet on the chemical silicon tetrachloride. [Plaintiffs' Exhibit No. 1]. From this the Plaintiffs would have the jury and now the Court find an industry standard. This presents two problems. First, the safety sheet merely states that "Silicon Tetrachloride reacts violently with water, causing a rapid release of heat and HCL vapors." The words are simply a statement of fact. The sheet does not say that water should not be applied to the spilled chemical. Indeed, there was no testimony that spraying large quantities of water on the chemical spills caused any problem. [R.Vol. 3, 6]. Second, the fatal flaw with the Plaintiffs' proffer is that it does not show an industry standard. The statute clearly requires "a commonly accepted and well-known safety standard within the industry." Evidence of what one company's practices are, assuming here they were even breached, does not prove an industry standard. Such may suffice to prove negligence, but negligence was not actionable even under the old statute. *See Cline v. Joy Mfg. Co.,* 310 S.E.2d 835 (W.Va.1983).

The Plaintiffs' argument that Carbide was a leader in the industry and, therefore, its standards are the industry's standards, not only flies in the face of the plain wording of the statute but also is unsubstantiated by the record. There was no evidence of what Carbide's ranking or respect quotient is or was in the chemical industry. A particular business's standards may very well be identical to those of the industry as a whole, and indeed in a responsible enterprise they will be, but the proof must run from the sum to the part, not vice-versa.

---

**23.** The Court gives little weight to Carbide's reference—and this also touches on the existence of an unsafe condition—to two workers who worked in the facility for over thirty years with

no ill effects. For lack of relevance the Court excluded the evidence that another worker with different exposures had contacted a disease similar to Mr. Handley's.

In adopting this element of recovery, the Legislature intended to identify conduct which fell below certain norms. To construe those norms as those set by *a* particular company without more does not provide the societal benchmark envisioned by the Legislature. As the Defendant aptly observed, it is far more egregious (and actionable) to violate standards upon which all agree than to violate one's own.

The fourth element required to be proven is that "notwithstanding the existence of the [three facts just mentioned, the] employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally." The key word is "intentionally." By the wording of the statute, it is obvious that "intentionally" means more than that the exposure was not by mere mistake or negligence. The statute also requires knowledge—knowledge of the three preceding facts. By the same token, the statute does not require proof that the employer *intended* to injure the employee by exposing him to the unsafe condition. That is the ultimate issue sought to be determined by the five-element test under the new statute. The law will infer such deliberate intent if the employer acted with knowledge in intentionally exposing the employee.

As a technical matter, a plaintiff failing on one of the three preceding elements has not only lost the war in that he has not proven *all* of the five elements, he has also lost the battle for element number four in that proof of it is partially dependent on proof of the three other elements. Nevertheless, the Court notes that, but for the lack of an industry standard, the Plaintiffs may have carried their burden in respect to the unloading process of the tankers.

On this issue, Carbide goes to great lengths to point out safety features such as equipment and procedures. This is another example that shows the interdependent relationship of these five elements. On the one hand, it could be said that any safety measures undertaken by an employee should be considered in relation to the first element. Certain safety precautions will often go a long way toward reducing an unsafe working condition in the first instance. On the other hand, acts of safety consciousness may impact upon the question of whether an employee was intentionally exposed. For instance, a specific unsafe working condition might be ameliorated by safety procedures such that it might not present a high degree of risk and a strong probability of serious injury or death. Safety procedures also diminish, if not negate the reasonableness of an inference of intentional exposure.

Finally, there is the fifth element to be proven: causation. It must be shown "[t]hat such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition." Again, this is an element which does not stand in isolation. The words "so exposed" relate back to the preceding element which dealt with intentional exposure. The spraying of the silicon tetrachloride spills with water, not being found to involve intentional exposure, or for that matter to be a specific unsafe working condition, does not qualify for consideration as to causation. Thus far, the proof going to the other specific working condition, the unloading of the silicon tetrachloride, is also deficient. It will be remembered that no violation of an industry safety standard was proven. Nevertheless, because the evidence was sufficient on the issue of intentional exposure, the Court will consider the element of causation as it applies to this specific working condition.

Dr. Owens testified that Sherman Handley's schleroderma was caused by "the inhalation of chemicals and agents in the work place, specifically, the amines and the silicon tetrachloride." It must be noted that this is a general statement of causation. The Fourth Circuit has recently issued an illuminating opinion dealing with expert testimony on causation when there are competing causes. In *Owens By Owens v. Bourns,* 766 F.2d 145 (4th Cir.1985), the defendant had been sued by the parents of a premature infant who was blinded by an excessive exposure to oxygen from

ventilator equipment manufactured by the defendant. The evidence showed that the infant had been exposed to high doses of oxygen several times—times other than those associated with the defendant's equipment. The court held that in the face of this evidence, the defendant's expert witnesses could not single out with a reasonable degree of medical certainty the defendant's equipment as the causative factor. Hence, the court reversed a judgment in the favor of the plaintiffs.

In *Owens* the various causative factors could be traced to more than one responsible party. In this instance, however, the evidence points to only one party as controlling the causative factors—Carbide.[24] Nonetheless, there is a parallel which can be drawn from the *Owens* case. Whereas in *Owens* the responsibility had to be placed on one wrongdoer with a reasonable degree of medical certainty, in this case the responsibility has to be placed on a specific unsafe working condition. The statute so commands. This requirement should not be read so that the unsafe condition has to be the *sole* causing agent; the Court thinks this too harsh. Rather, the specific unsafe working condition must at least contribute or share in the causation of the injury. The Court emphasizes, though, that the injury or disease must be traced to the unsafe condition. To hold otherwise would be to allow the Plaintiff to pick and choose about the work place to piece together a cause of action under the statute. With this in mind, the Court recognizes that Dr. Owens testified that silica particles were present in the silicon tetrachloride vapors, which if inhaled could cause scleroderma. Accordingly, the Court finds sufficient evidence on this point to support the jury's conclusion insofar as it relates to this element.

Remaining on the subject of silicon tetrachloride, there is the episode which Handley appears to point to as precipitating his condition. It does not involve unloading the tankers or spraying water on the silicon tetrachloride spills. Rather, the incident involved sewering high-acid content material from tanks near Building 156. The material was ethyl silicate, the ultimate product, which contained too much hydrochloric acid to be marketable. [R.Vol. 1, 44]. Handley and another worker were helping to shut down the equipment around the tanks. [R.Vol. 1, 52]. After completing this task, they then began sewering the material. The wind shifted occasionally and Handley had to run out of the area two or three times. [R.Vol. 1, 53]. He claims that he inhaled a lot of vapors on that shift. Two or three days later his problems began to manifest themselves. [R.Vol. 1, 53].

Handley refers to this incident as when he was exposed to a high quantity of sulfur tetrachloride. [R.Vol. 1, 52]. He obviously meant to say silicon tetrachloride. In any event, the evidence clearly shows that silicon tetrachloride was not then present at the site. The silicon tetrachloride had been broken down into hydrogen chloride and ethyl silicate. [R.Vol. 1, 88]. There is thus a possible causation problem. As is discussed more fully *infra*, there was no evidence that ethyl silicate caused scleroderma, and the evidence linking hydrogen chloride to scleroderma was fragile indeed. [R.Vol. 4, 59]. A more basic problem is the cursory treatment this episode was given. There was no evidence as to the dangers of this procedure, what Carbide knew of the dangers and what industry standard applied. The evidence was simply insufficient.

### B. *Metaphenylenediamine.*

Metaphenylenediamine, also referred to as M-phenylenediamine, is another chemical which was not manufactured at the Carbide facility; it was purchased from du-Pont. [R.Vol. 5, 10]. Initially the chemical came into the plant in a dry granular form, similar to the consistency of rice. Handley testified that he handled the first shipment which came into the plant. [R.Vol. 1, 64]. He and other workers took the fifty-pound

---

**24.** The medical expert testified—and he was the only expert who testified—that Handley's prior work experience did not cause his scleroderma. [R.Vol. 4, 46].

drums in which the material was shipped and dumped the contents into the hopper—the top of a reactor. [R.Vol. 1, 16]. When they did this, dust was created. Their safety equipment at the time consisted of a hard hat, goggles and a small dust mask. [R.Vol. 1, 66]. Shortly after this first shipment was handled, the men reported that their hands and hair turned yellow and a couple of men reported instances of black· urine. Handley complained of his hands and hair being affected. Upon learning of these problems, the Carbide supervisors told the workers, according to Handley, "Well, we are going to start making you all wear oxygen masks, suit up with these vinyl-like plastic coveralls, two pair of gloves, a pair of Playtex gloves like you wash dishes with and a pair of chemical gloves and then a full oxygen mask." [R.Vol. 1, 17]. Handley reported that though the workers wore the equipment, their hands continued to turn yellow. [R.Vol. 1, 17]. Only two more runs, however, were made of the metaphenylenediamine before Carbide switched to a moltant form. [R.Vol. 1, 66].

The switch to a moltant form of the chemical was apparently precipitated by an incident which aroused much controversy in the community. Some dust from the metaphenylenediamine had been deposited on top of the reactor processing the chemical. [R.Vol. 1, 19]. Some employee blew the dust off the reactor with an air hose. [R.Vol. 1, 69]. The particles became airborne and were carried across the river to a nearby car dealership. The paint on several cars were damaged by the chemical. After this embarrassing incident, Carbide persuaded duPont to sell it the chemical in a moltant form. [R.Vol. 5, 18].

The moltant chemical was transported to the Carbide plant in tank trucks. It was unloaded by a procedure similar to that used in unloading the silicon tetrachloride. The problem encountered in transporting the chemical, however, was that it "froze" at 140° Farenheit. [R.Vol. 5, 53]. If it was not kept warm while pumping it to the storage tanks at the facility, the chemical would solidify and clog the hoses. To keep the hoses free of such clogging, Carbide wrapped copper tubing around the hoses. [R.Vol. 1, 30]. Steam was then pumped through the copper tubing. [R.Vol. 3, 23]. The evidence disclosed a few times when the hoses would freeze and the workers had to be especially persistent in applying steam to the hose and accompanying fittings. [R.Vol. 3, 26]. On at least one occasion, a supervisor had to "suit up" and disconnect a frozen hose. Handley was not present at the time. [R.Vol. 1, 60].

The employees working around the unloading process of the moltant chemical wore rubber boots, vinyl boots, vinyl gloves, monogoggles, safety glasses, hard hats and a face shield. [R.Vol. 5, 51]. Scott air packs were available, but were seldom used. _Id._ Although the evidence was conflicting, there was testimony to the effect that the metaphenylenediamine would vaporize when it escaped the hose and came in contact with the steam filled tubing. [R.Vol. 1, 30].

■ Turning to the question of how the handling of this chemical fares under the five-element test of the new statute, the Court first notes that the handling of the chemical in granular and moltant forms should be addressed as separate specific working conditions. Thus, in addressing first the dry granular use of the chemical, the Court notes a couple of significant flaws in the Plaintiffs' proof. First, given that there may have been a danger in handling the chemical in the dry form without the appropriate safety equipment, the evidence is wanting as to the fact that Carbide had a subjective realization of it. In fact, the evidence demonstrated that it did not have knowledge of the dangers and that it reacted swiftly when it learned of them. The Plaintiffs introduced a safety sheet for metaphenylenediamine on which the following words appeared: "Material is a strong dying agent. Exposure to skin and clothing should be avoided or stains will result." [Plaintiffs' Exhibit No. 2]. The Plaintiffs point to that language as proving the state of Carbide's knowledge, but the evidence

shows the words were added only after the first instance of handling the chemical. [R.Vol. 1, 68]. That this is so was corroborated by the Plaintiffs when they introduced an earlier safety sheet which did not contain the warning. [Plaintiffs' Exhibit No. 3]. So, the lack of knowledge negates the legal significance of the first run. The safety procedures followed in the next two runs negates any inference of an unsafe working condition. Moreover, the safety procedures followed in the last couple of runs refute any allegation of intentional exposure. Finally, the Plaintiffs fail to show any industry standard applicable to the handling of a dry chemical such as this.

As to the steam heating of the moltant metaphenylenediamine, the Plaintiffs also fail to show the violation of a commonly accepted and well-known safety standard within the chemical industry. The Plaintiffs again point to only an internal safety sheet for an arguable violation. [Plaintiffs' Exhibits Nos. 2 and 3].

### C. *Scrubber on the Ethyl Silicate Process.*

Located outside of Building 156 was a piece of equipment commonly referred to as a "scrubber." It was ancillary to the production of ethyl silicate. To elaborate, silicon tetrachloride and ethanol were mixed together in Building 156. [R.Vol. 3, 14]. They would spontaneously react to form ethyl silicate and the byproduct, hydrogen chloride, more commonly known as hydrochloric acid. [R.Vol. 5, 21]. There was uncontradicted testimony that the silicon tetrachloride reacted 100% with the ethanol. [R.Vol. 2, 85 and Vol. 5, 61]. In other words, no silicon tetrachloride remained after the reaction. [R.Vol. 2, 85]. Because more ethanol was used than was necessary, the excess was pumped back to storage tanks to be used again. [R.Vol. 3, 14]. The ethyl silicate was also transferred to storage tanks. [R.Vol. 3, 38]. The hydrogen chloride, however, was passed in a

gaseous state to the scrubber where it was mixed with water. [R.Vol. 3, 15 and Vol. 5, 22]. Having been absorbed by the water, it was transferred in a liquid state to limestone pits where it was neutralized. [R.Vol. 3, 15].

The problem with the scrubber was that it did not always contain the HCL fumes. [R.Vol. 1, 38 and Vol. 2, 72]. In fact, there was much evidence that the scrubber's dysfunction had been a sore point with the workers for years. [R.Vol. 3, 29]. They complained often about the fumes emitted by the scrubber. Although the scrubber was outside the building, [R.Vol. 2, 61, 86] the workers, including Handley, testified that the fumes often seeped into Building 156 when there was a breeze. Additional evidence showed that an exhaust system (a series of fans) utilized to rid the building of fumes actually may have pulled fumes into the building and up through the working areas. [R.Vol. 2, 87, 92].

Despite the extensive evidence introduced regarding the scrubber, there is a weakness with the Plaintiffs' case as it pertains to this working condition. The Plaintiffs' counsel argued in opposition to Carbide's motion for a directed verdict that the HCL fumes coming from the scrubber contained silica particles. This assertion may or may not have been accurate. A review of the record, however, does not reveal that this information was presented to the jury.[25] The medical expert, Dr. Owens, testified that when silicon tetrachloride was hydrolized and became a vapor, it became hydrogen chloride (hydrochloric acid) and silicon dioxide (silica). [R.Vol. 4, 59]. The context of the doctor's statements revealed that he was speaking of the occasions when water was applied to silicon tetrachloride, such as in the case of a spill. [R.Vol. 4, 49]. He did not testify that there would still be silica particles with the hydrogen chloride gas when it was transported to the scrubber. In fact, the

---

**25.** Retired Carbide employee Leslie Lewis testified that "I have seen Building 156, first floor, literally covered inside with silicon tetrachloride." [R.Vol. 2, 54]. He did not, however, testify that the chemical came from the scrubber. He stated that it came from the lines and tank car spots.

only evidence adduced was to the effect that the ethyl silicate was pumped out of the reactor to storage tanks and never approached the scrubber. Dr. Owens had testified that inhalation of silica particles could lead "to the development of the disease that is called silicosis." [R.Vol. 4, 59]. He then stated that silicosis could lead "to scarring and fibrosis, *sclerosis*, if you will, in a lung." *Id.* (emphasis added). His comments on hydrogen chloride (hydrochloric acid) as a causative agent, on the other hand, were less direct. He testified as follows: "Hydrochloric acid is a potent irritant, primarily to air, well, it irritates virtually every surface. The surfaces that get the brunt of the damage are around the eyes, in the mouth and the breathing tubes." *Id.* After discussing the silica particles, the doctor concluded: "So both the breakdown products of silicon tetrachloride are significant problems to the lung." [R.Vol. 4, 60]. Therefore, unlike his testimony on the silica particles, the doctor did not expressly tie hydrogen chloride to schleroderma (sclerosis). Moreover, he testified that the silica was synonomous to silicon dioxide. Whether ethyl silicate is a silica which produces like effects is without evidentiary basis.

■ The Court seriously doubts that the jury could draw a legitimate inference on causation from the incomplete factual picture it was given. In any event, the factor which conclusively precludes the Plaintiff's recovery on this working condition is the element which requires, *inter alia*, violation of a safety standard. No evidence of any industry safety standard applicable to the scrubber unit or its like was advanced by the Plaintiffs.

### D. *Dimethylethanolamine (DMEA).*

■ As to this chemical, little needs to be said. It was referred to in passing by a couple of witnesses. [R.Vol. 3, 21]. Handley mentioned that on one occasion he stepped in a spill and burned his feet. [R.Vol. 1, 28]. He also testified that the common procedure for handling spills of this chemical was similar to that of silicon tetrachloride and metaphenylenediamine. The workers would wash it away with water. Unlike silicon tetrachloride and metaphenylenediamine, however, even Carbide's internal safety sheet had nothing to say about placing water on the chemical. [Plaintiffs' Exhibit No. 5]. Thus, among other failings, there was no showing of an industry safety standard having been violated.

### E. *Sulfur Trioxide.*

The Court is unsure as to why this chemical was even mentioned during the trial. There was evidence that the chemical was hazardous, but the same could be said for most of the chemicals handled by Carbide. No evidence was advanced to prove that the chemical was handled unsafely. At one point the Plaintiffs' counsel inquired of Handley as to whether he was ever present when anything happened respecting this chemical compound. Handley replied, "No, not really. We had a few small drops of SO3, nothing major." [R.Vol. 1, 41]. Without needless elaboration, the Court concludes that the allusion to this chemical compound, and the conditions surrounding its use, does not come close to satisfying any of the five elements under the new statute's test.

### F. *Amines.*

Dr. Owens testified that Handley's condition was caused in part by exposure to amines. As mentioned, the term applies to a group of chemicals. Included within that group is DMEA. It was the only amine about which sufficient evidence was presented to even require an application of the statutory test.

### V. *Conclusion*

The result in this case may seem unpalatable to some. The undisputed evidence shows that Sherman Handley has schleroderma. Moreover, it is reasonable to infer that his condition was caused by his employment at Union Carbide Corporation. The question before the Court, however, is not one of injury during the course of employment. This Court will leave that

question to the expertise of the West Virginia Worker's Compensation Commission. The question here is one of deliberate intent. The Legislature has decided to make the test for finding deliberate intent a strict one. Others may quarrel with that decision, but this Court cannot. A court must apply the law. The Plaintiffs have not carried the burden placed upon them by that law.

Accordingly, the Defendant's motion is hereby GRANTED; the jury verdict and the judgment order of August 9, 1985, entered thereon are hereby ORDERED set aside and vacated as to Plaintiffs Sherman Handley and Linda Handley, and final judgment shall be entered in favor of the Defendant and against the Plaintiffs Sherman Handley and Linda Handley.